[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JANUARY 17, 2008
THOMAS K. KAHN
CLERK

No. 06-14076

_____

D. C. Docket No. 05-00023-CR-5-001-MCR

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

THOMAS G. MERRILL,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Florida

_____

**(January 17, 2008)**

Before EDMONDSON, Chief Judge, HULL, Circuit Judge, and FORRESTER,* District Judge.

---

*Honorable J. Owen Forrester, Senior United States District Judge for the Northern District of Georgia, sitting by designation.

FORRESTER, District Judge:

## I. BACKGROUND

From 1994 until 2004, Dr. Thomas Merrill ("Merrill"), an osteopath licensed to practice medicine in Florida and registered under the Controlled Substances Act, 21 U.S.C. §§ 801, *et seq.*, operated a clinic in Apalachicola, Florida. On August 2, 2005, the Government filed a 100-count indictment against Merrill. The indictment charged Merrill with various counts of wire fraud (Counts 1-18), health care fraud[1] (Counts 19-24), and illegally prescribing narcotics outside the course of professional practice under the Controlled Substance Act (Counts 25-100). Nine of the counts in the indictment alleged that death resulted from either the health care fraud or the use of the narcotics prescribed outside the course of professional practice (Counts 20-24, 39, 65, 69, and 78). On January 30, 2006, Merrill was convicted of 98 of the 100 counts. He was sentenced on

_____

[1]18 U.S.C. § 1347 states:
Whoever knowingly and willfully executes, or attempts to execute, a scheme or artifice --
      (1) to defraud any health care benefit program; or
      (2) to obtain, by means of false or fraudulent pretenses, representations, or
      promises, any of the money or property owned by, or under the custody or
      control of, any health care benefit program,
in connection with the delivery of or payment for health care benefits, items, or services, shall be fined under this title or imprisoned not more than 10 years, or both. If the violation results in serious bodily injury (as defined in section 1365 of this title), such person shall be fined under this title or imprisoned not more than 20 years, or both; and if the violation results in death, such person shall be fined under this title, or imprisoned for any term of years or for life, or both.

July 10, 2006, to serve various concurrent sentences of five, ten, and twenty years on ninety-two of those counts. He was also sentenced to life imprisonment on six of the counts to run concurrently with the other sentences. He appeals his convictions. We affirm Merrill's convictions.

At trial, the Government presented the expert testimony of Dr. Theodore Parran, a board-certified internal medicine physician with sub-specialty training in addiction medicine. Dr. Parran, who was qualified as an expert in the areas of pain management, addiction medicine, and prescribing controlled substances, testified based on his review of eighty patient files.

This testimony and the documentary evidence demonstrated that Merrill wrote multiple prescriptions for similar controlled substances for the same patient during the same visit; that he wrote prescriptions for patients on whom he performed no or very minimal physical examination; that he failed to obtain old or prior medical records on his patients; that he failed to log all prescriptions written for his patients in their charts; that he failed to run tests, including toxicology screens, recommend physical therapy, or order consultations with a specialist; that he wrote prescriptions for patients whose behavior and physical appearance should have raised suspicion that they were addicted to controlled substances; that he wrote prescriptions for his employees; that he wrote prescriptions for at least one

patient who he had heard was selling the prescribed drugs; that he wrote prescriptions for at least two patients who had altered prescriptions; that he wrote prescriptions for at least one patient who had overdosed on controlled substances during his care; that the trend in his prescribing was to increase a patient's dosage and number of pills with each prescription even on occasions where the files indicated that the patient had "no new complaints"; that he frequently refilled prescriptions early without any subsequent documentation in the charts; and that he ignored warnings of possible addiction from insurance companies, pharmacies, and even previous doctors.

Dr. Parran testified that these practices are irregular, dangerous, and are not the legitimate practice of medicine. Dr. Parran repeatedly stated that prescriptions written to particular patients appear to be outside the usual course of medical practice and for other than legitimate medical purpose (e.g., R 15-222 at 69, 78, 83, 88, 103, 110, 113, 123, 125, 132, 136, 139, 144, 151, 146, 156, 160, 163, 165, 168-69, and 172). At times during his testimony, Dr. Parran characterized Merrill's prescription-writing behavior as "unbelievable," as "an invitation to disaster," as "ill-advised," as "inappropriate," "inconceivable," "bizarre," "astonishing," and "incredible" (R 15-222 at 84, 103, 109, 118, 126, 156, 163, and 167). Merrill did not object to the admission of any of this testimony.

4

Merrill was charged with healthcare fraud and with either fraudulent acts or unlawfully dispensing controlled substances resulting in the death of Bridgette Persinger, Leslie Dyer, Deanna Hayes, Kenneth Noles, and Katherian Seay.  In each case the medical examiner who performed the autopsy on each victim determined the cause of death to be drug overdose of a controlled substance which Merrill had recently prescribed (R 12-219 at 140, 208, 260, 279 and R 13-220 at 113).

Merrill contends that the district court erred in six ways.  Merrill contends that there was insufficient evidence at trial to support conviction on the counts in the indictment charging him with providing controlled substances to patients which resulted in their deaths.  Merrill also asserts that the trial court admitted an avalanche of prejudicial and irrelevant evidence in the form of prescriptions of Merrill's patients who were not the subject of any count in the indictment.  He claims he was prejudiced by the trial court's decision to move the trial from Panama City to Pensacola, which he contends was an inconvenient forum.  Next, Merrill avers that the trial court wrongly instructed the jury as to intent and impermissibly shifted the burden of proof to the Defendant.  Merrill argues that Assistant United States Attorney Kunz committed prosecutorial misconduct in misrepresenting evidence to the court and the jury.  Merrill claims that he was

5

denied effective assistance of counsel. Finally, Merrill asserts that the trial court wrongly dismissed an African-American juror immediately after the jury had been charged. For all of these reasons, Merrill requests this court reverse his conviction and remand the matter for a new trial.

## II. DISCUSSION

### A. Sufficiency of the Evidence

In nine counts, Merrill was charged with committing acts that resulted in the deaths of five patients: Bridgette Persinger, Leslie Dyer, Deanna Hayes, Kenneth Noles, and Katherian Seay. Merrill claims the Government presented insufficient evidence at trial to prove his actions resulted in these deaths. Specifically, Merrill claims that each of the patients who died was using illicit drugs, alcohol, and other prescription drugs. Merrill further contends that there was no evidence at trial by which it could be determined that any one of the deceased patients did actually ingest the drugs prescribed by Merrill.

The determination of whether the record contains sufficient evidence to support a jury's verdict is a question of law which we review *de novo. United States v. Byrd*, 403 F.3d 1278, 1288 (11th Cir. 2005) (citing *United States v. Harris,* 20 F.3d 445, 452 (11th Cir. 1994)). In this task, "we view the evidence in the light most favorable to the government," drawing "all reasonable inferences

and credibility choices" in the Government's favor. *Id.* As Merrill states in his briefing, "[i]t is not necessary that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt, provided that a reasonable trier of fact could find that the evidence established guilt beyond a reasonable doubt." *Harris*, 20 F.3d at 452 (citation omitted). "A conviction must be upheld unless the jury could not have found the defendant guilty under any reasonable construction of the evidence." *Byrd*, 403 F.3d at 1288 (quoting *United States v. Chastain,* 198 F.3d 1338, 1351 (11th Cir. 1999)).

With regard to Merrill's first contention that each of these patients who died had other substances, such as alcohol, illicit drugs, or prescription medicine, not prescribed by Merrill in their systems at the time they died, the Government put on the witness stand the medical examiner who performed the autopsy on each of these patients. In each case the medical examiner testified that drugs of the same type as prescribed by Merrill were the cause of death.

Insofar as Merrill is contending that the Government failed to show that his patients' deaths were caused by the drugs he prescribed as opposed to drugs prescribed by other doctors or obtained on the street, we find that there was sufficient evidence for a reasonable trier of fact to find guilt beyond a reasonable

7

doubt. Within two-and-a-half weeks of their deaths, Merrill prescribed for each of these patients the exact type of drug the medical examiner found to have caused their deaths. In three cases, there were even pill bottles or prescription medicine specifically prescribed by Merrill in the immediate vicinity of the deceased. While the Government did not exclude every reasonable hypothesis of innocence, by showing that Merrill was the only source of the patients' medications, a jury under a reasonable construction of the evidence, could have found that Merrill's prescriptions were the actions which led to these patients' deaths.

**B.     Evidence of Other Prescriptions**

Merrill contends that the district court abused its discretion when it allowed the Government to introduce evidence of more than 33,000 prescriptions for controlled substances that Merrill wrote between January 2001 and May 2004 and a chart summarizing these prescriptions because such evidence was irrelevant and prejudicial.

During the course of its investigation, the Government subpoenaed pharmacy records of all the prescriptions written between January 2001 and May 2004 which contained Merrill's DEA registration number. A pharmacist must use his unique DEA registration number to prescribe controlled substances. One hundred thirteen pharmacies responded to the Government's request and produced

more than 33,000 prescriptions identified with Merrill's DEA registration number. The Government introduced these prescriptions, 99.4% of which were actually for controlled substances.[2] Of the controlled substance prescriptions, 81% were for four particular drugs: hydrocodone[3] (Schedule II) (12,405 prescriptions), diazepam[4] (5,907) (Schedule IV), oxycodone[5] (4,464) (Schedule II), and alprazolam (4,326) (Schedule IV). The Government, through an intelligence analyst with the National Drug Intelligence Center, also compiled and introduced a detailed summary of this material. The summary contained five tabs which (1) detailed each patient's name, prescription number, write date, fill date, quantity,

---

[2]Controlled substances are a subset of drugs that carry a risk of abuse or misuse. As Professor Doering explained during Merrill's trial, there are five levels, or schedules, of controlled substances. Schedule I drugs, such as heroin, are drugs with no medical benefit, and they have the highest level of abuse or misuse. Schedule II drugs have a recognized medical benefit, but they "require the highest degree of scrutiny and supervision in terms of making sure they don't end up in the wrong hands." Schedule III-V drugs have fewer controls than Schedule I or II drugs, and the major difference among the three schedules is the degree of punishment for not handling them properly. (R 13-220, at 13-17).

[3]Hydrocodone is the active ingredient in pain relievers such as Vicodin and Lortab. (R 13-220, at 16).

[4]Diazepam, or Valium, and alprazolam, or Xanax, are benzodiazepines which are often used to reduce anxiety or help people sleep. (R 13-220, at 21-22).

[5]Oxycodone is a powerful pain-relieving medicine derived from opiates like morphine. Oxycodone comes in immediate release forms such as Percodan, Percocet, and Tylox, which release a high dosage of oxycodone immediately and provide short-term pain relief, and continuous release forms such as OxyContin, which release a lower dosage of oxycodone continuously over a twelve-hour period in order to provide long term pain relief. (R 13-220, at 19-20).

drug name, strength, total milligrams, and pharmacy; (2) calculated the total

number of pills and prescriptions for each patient for each drug; (3) displayed the

total number of pills prescribed of each drug; (4) calculated what percentage each

drug represented in the total number of controlled substances prescribed; and (5)

displayed the total milligrams prescribed for each of the five most prescribed

drugs. An excerpt of the tab one data for two patients is attached to this opinion as

Exhibit 1 as an example of the type of data this summary illustrates.[6] This excerpt

reveals that Merrill prescribed the same patient multiple controlled substances in a

given visit;[7] that Merrill prescribed multiple drugs from the same drug category to

a given patient during a given visit;[8] that Merrill re-authorized prescriptions for

the same controlled substance within less than a month of each other;[9] and that

---

[6]The full names of the two patients have been removed out of respect for their privacy and that of their families.

[7]For example, Merrill prescribed BP seven controlled substances on March 22, 2002.

[8]For example, Merrill prescribed two benzodiazephines, Xanax, or alprazolam, and Dalmane, or flurazepam, to BP on April 23, 2002. (R 13-220, at 33).

[9]Professor Doering testified as to how prescriptions are normally filled. "Generally, an insurance company will only pay for a month's worth of medication. So typically a three-times-a-day medication would be issued for 120 of [the] dosage units." (R 13-220, at 32). Here, for example, Merrill prescribed BB thirty diazepam on January 12, 2004, and sixty diazepam on January 13, 2004. BB also filled a Merrill prescription for 75 hydrocodone/apap on March 10, 2003, and filled one for 75 more a mere three days later.

Merrill frequently prescribed high doses.[10]  The district court admitted both the individual prescriptions and the summary over defense counsel's objection that not all of the documents were related to the counts of the indictment.

We review the district court's evidentiary rulings on the individual prescriptions and the summary for clear abuse of discretion.  *United States v. Baker*, 432 F.3d 1189, 1202 (11th Cir. 2005).  "An abuse of discretion arises when the district court's decision rests upon a clearly erroneous finding of fact, an errant conclusion of law, or an improper application of law to fact." *Id.*  The district court has broad discretion to determine the relevance and admissibility of any given piece of evidence.  *United States v. Smith*, 459 F.3d 1276, 1295 (11th Cir. 2006).  Evidence is admissible if relevant and only relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  Fed. R. Evid. 401, 402.  The district court also has the discretion to exclude relevant evidence if the court finds that the probative value of the evidence "is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time,

---

[10]For example, Merrill prescribed BP two-milligram strength Xanax, which is the highest strength of that particular medication.  (R 13-220, at 3).  Merrill also prescribed Dalmane, or flurazepam, at the higher strength of 30 milligrams, and instructed BP to take not one but two at bedtime.  (*Id.* at 33).

or needless presentation of cumulative evidence." Fed. R. Evid. 403. "But Rule 403 is an extraordinary remedy which should be used only sparingly since it permits the trial court to exclude concededly probative evidence. In criminal trials relevant evidence is inherently prejudicial. [Thus, t]he rule permits exclusion only when unfair prejudice substantially outweighs probative value." *United States v. Betancourt*, 734 F.2d 750, 757 (11th Cir. 1984) (controlled substance case charging physicians). Therefore, when reviewing the district court's decision to exclude a given piece of evidence, "we look at the evidence in a light most favorable to its admission, maximizing its probative value and minimizing its undue prejudicial impact." *United States v. Brown*, 441 F.3d 1330, 1362 (11th Cir. 2006). Under this extremely deferential standard, we will look to the evidence as a whole and determine whether the specific evidence questioned by Merrill was admissible under Rules 401-403 in light of all the evidence that was ultimately before the court.

Looking at the challenged evidence in this light, we have determined that it was relevant and that its probative value was not outweighed by its potential for prejudice. The Government indicted Merrill for devising a scheme to defraud Medicaid and other insurance providers. (R 1-3, at 6). As part of the scheme, Merrill was alleged to have "prescrib[ed] excessive and inappropriate quantities

12

and combinations of controlled substances to patients outside the usual course of professional practice." (*Id.* at 7).  The Government also indicted Merrill on numerous counts of dispensing controlled substances in violation of the Controlled Substances Act, 21 U.S.C. § 841.

> In order to lawfully possess or dispense a controlled substance a doctor must fulfill two requirements.  He must be lawfully licensed to practice medicine and he must be registered by the Drug Enforcement Administration.  Doctors that are registered are then authorized to possess, distribute or dispense controlled substances.  However, they may do so only in the usual course of professional practice and for a legitimate medical purpose.

*Betancourt*, 743 F.2d at 757.  At trial, Merrill claimed that he had not violated the Controlled Substances Act because all his controlled substance prescriptions were made in good faith and for legitimate medical purposes.

The individual prescriptions and summary were relevant to prove that Merrill prescribed  "excessive and inappropriate quantities and combinations of controlled substances" and that in doing so he acted "outside the usual course of professional practice."  First, the Government could only prove "excessive and inappropriate quantities and combinations" by presenting evidence on the quantities and combinations themselves and then comparing those quantities and combinations to a relevant norm to show that they were excessive and inappropriate.  The summary was thus relevant to establish the quantities and

13

combinations that Merrill was prescribing, and if the summary itself was relevant, the individual prescriptions underlying it were likewise relevant. The individual prescriptions and the summary are identical data sets arrayed in two different fashions. The summary is merely a tabular form of the individual prescriptions. The Government relied on the testimony of Professor Doering and Dr. Parran to provide the relevant norm. Their testimony revealed that the sheer volume of abusable drugs contained in the summary raised an inference of excessiveness and impropriety. Having reviewed the summary, Professor Doering testified:

> [A]s I read through those profiles, I thought, oh, goodness, this is not right, there is something wrong here. And what I saw, as I reviewed these profiles, was a pattern of overprescribing. And although I'm not testifying necessarily about the appropriateness of each one in a given patient, I thought, wow, there is something not right about this whole packet.

(R 13-220, at 51). Dr. Parran testified:

> [A] prescription [pattern] like this with 81 percent of the prescriptions over a four-year period of time being controlled drugs of one of these three – four groups is something that I would be exceedingly concerned about, even if a person was an oncologist working only in a hospice, I'd be exceedingly concerned about. To decide whether an individual prescription was for legitimate medical purpose or within the course of usual medical practice requires looking at the chart of that individual patient.

(R 15-222, at 173).

14

Second, the frequency and doses of the prescriptions in the summary raised an inference of excessiveness and impropriety. The summary revealed that patients were coming in for visits less than two weeks apart to receive maximum dose prescriptions of the same drug. The expert pharmacist testified:

> When I first looked at these . . . I was horrified. I had to shake my head and clear my eyes to make sure I was reading it correctly, that in fact, they were all issued to the same patient on the same day in quantities that for most of the meds are the maximum doses or super maximum doses. And I thought no, you've got to be kidding me, not for one patient, not for the same patient.

(R 13-220, at 36-38). Third, the number of drugs being prescribed to each patient and the combination of drugs being prescribed to each patient raised an inference of inappropriate and excessive conduct. The summary revealed that some of the patients were prescribed up to seven or eight drugs on the same day. The pharmacist testified, "Anytime you get – it's a reality that anytime you get more than about three or four drugs on the same patient, that you're in serious trouble – serious jeopardy of having side effects and unexpected outcomes." (R 13-220, at 46). The summary also revealed that Merrill prescribed multiple drugs from the same drug category to the same patient at the same time, for example, prescribing two benzodiazepines. These prescription combinations are almost per se outside the scope of usual medical practice. "There is no legitimate medical purpose for the combining prescribing of valium [a benzodiazephine] and xanax [a

15

benzodiazephine], each of them two or three times a day in the same patient at the same time. There just isn't. They are very similar drugs, and prescribing them both together makes no clinical sense." (R 15-222, at 54).

Merrill argues that even if this evidence is relevant, it should be inadmissible as evidence of uncharged criminal activities or "bad acts" under Fed. R. Evid. 404(b).[11] As discussed above, evidence of the quantity and combination of prescriptions Merrill wrote during the relevant period is directly related to the issue of whether Merrill committed health care fraud by "prescrib[ing] excessive and inappropriate quantities and combinations of controlled substances to patients outside the usual course of professional practice" and whether Merrill was relieved of liability under the Controlled Substances Act because he acted in the "usual course of professional practice." A jury may consider prescription data sets outside those specifically charged in the indictment to determine whether a physician has exceeded "the legitimate bounds of medical practice" and "as evidence of a plan, design, or scheme." *See United States v. Harrison*, 651 F.2d 353, 355 (5th Cir. July 20, 1981). Thus, this evidence was outside the scope of Rule 404(b). To the extent that it can be argued that *each* prescription is

---

[11]Fed. R. Evid. 404(b) states, "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident . . . ."

16

uncharged misconduct, each is admissible under Rule 404(b) to show evidence of a plan. Thus, the district court did not abuse its discretion in admitting either the summary or the individual prescriptions underlying it.

**C.      Transfer of the Case from Panama City to Pensacola**

Merrill argues that the trial court abused its discretion when it "violated" Rule 18 of the Federal Rules of Criminal Procedure by moving the trial more than 100 miles away from Panama City to Pensacola over defense objections. Merrill argues that the transfer was solely for the convenience of the trial court and had nothing to do with the convenience of Defendant, his witnesses, or the prompt administration of justice. Merrill stresses that Rule 18 is mandatory and provides for the convenience of the defendant and its witnesses, but not for the convenience of the court. Merrill likens this case to *United States v. Fernandez*, 480 F.2d 726 (2d Cir. 1973) (criticizing moving the trial 26 miles where the only person convenienced was the judge). He states that the transfer was made despite repeated defense counsel objections, alternatives in and around Panama City, and requests that the move be to Tallahassee. He argues that the transfer was devastating to trial preparation, denied him a fair venire, and presented a severe financial burden on the defense to the point that he was declared indigent and the

court had to grant him Criminal Justice Act funds. Merrill seeks to have this court

vacate the conviction and remand for a new trial in Panama City.

A district court has discretion to fix the place of a trial in any division

within the district, and we review the district court's decision only for abuse of

discretion. *United States v. Pepe*, 747 F.2d 632, 648 (11th Cir. 1984); *United*

*States v. Betancourt*, 734 F.2d 750, 756 (11th Cir. 1984).

The Sixth Amendment to the United States Constitution guarantees a speedy

and public trial in the state and district wherein the crime was committed.

*Betancourt*, 734 F.2d at 756 (citing *United States v. Anderson*, 328 U.S. 699, 704,

705 (1946)). The district means the judicial district of the United States Courts.

*Id.* (citing *United States v. James,* 528 F.2d 999, 1021 (5th Cir. 1976)).

Fed. R. Crim. P. 18 states:

> Unless a statute or these rules permit otherwise, the government must
> prosecute an offense in a district where the offense was committed.
> The court must set the place of trial within the district with due regard
> for the convenience of the defendant and the witnesses, and the
> prompt administration of justice.

Rule 18 allows a court to consider "the prompt administration of justice" in

fixing the place of trial, and "matters of security clearly fall within that

consideration." *United States v. Afflerbach,* 754 F.2d 866, 869 (10th Cir. 1985).

In addition,

18

the prompt administration of justice includes more than the case at bar; the phrase includes the state of the court's docket generally. The court must balance not only the effect the location of the trial will have upon the defendants and their witnesses, but it must weigh the impact the trial location will have on the timely disposition of the instant case and other cases.

*In re Chesson,* 897 F.2d 156, 159 (5th Cir. 1990) (per curiam).

In this case, the district court considered Merrill's interest in the trial remaining in Panama City but found that interest outweighed by space concerns. Specifically, the court noted that there was only one courtroom in the Panama City federal courthouse capable of handling Merrill's long trial. This courtroom was not available as it had been assigned to a newly-appointed judge. The court also found that the juvenile justice courthouse in Panama City, suggested by Merrill as an alternate location for the trial, was not a viable option due to security concerns associated with a federal criminal trial.

Having found that the matter could not remain in Panama City, the court considered the transfer of the case either to Tallahassee, favored by the defense, or to Pensacola, favored by the Government. In doing so, the trial judge explicitly considered all of the factors under Federal Rule of Criminal Procedure 18.

Specifically, in addressing the convenience of the Defendant and his counsel, the court noted that the travel time between Panama City and Pensacola is only one minute longer than the time between Panama City and Tallahassee. It

19

found that hotel space, office availability, and jury diversity were equal in both locations.

In addressing the convenience of the witnesses, the trial court indicated that the majority of defense witnesses were from Panama City, and the Government's witnesses were from various places around the country. The court found that air travel was more convenient to Pensacola than to Tallahassee, that it would impose no additional burden to have the defense witnesses travel from Panama City to Pensacola rather than to Tallahassee, and that most witnesses would have to travel only one time.

Finally, in addressing the prompt administration of justice, the trial court found that a trial in Panama City would require shutting down the Pensacola docket for three weeks, affecting other litigants because Judge Rodgers is the only active judge in the Pensacola Division. She stated that if the trial were held in Pensacola, she could handle many grand jury and other emergency matters during the trial but could not do so were she in Tallahassee. The court stated that having considered all three factors, the last of these required the case to be tried in Pensacola.

We find that the trial court did not abuse its discretion in moving this case from Panama City to Pensacola, Florida. As noted by the court, the facilities in

Panama City were either not available for use or lacked necessary security measures. In deciding to transfer the case to Pensacola rather than Tallahassee, the trial court carefully considered all of the factors enumerated in Federal Rule of Criminal Procedure 18. The court found that neither the convenience of the Defendant nor the convenience of the witness greatly favored either location. Moreover, the court found that the prompt administration of justice in the court's docket mandated a transfer to Pensacola.

**D.      Jury Instructions**

Merrill contends that the trial court, in charging the jury, erred in two ways. First, he contends that the trial court misunderstood what the Government had to prove under the Controlled Substances Act, section 841. Merrill argues that the court did not properly instruct the jury by failing to state that the Government must prove that Merrill knew and intended to act outside the course of professional medical practice. Second, Merrill claims that in the instructions, the use of "Defendant asserts" and "Defendant maintains" improperly shifted the burden to the defense.

We review a trial court's rejection of a proposed jury instruction for an abuse of discretion. *United States v. Garcia*, 405 F.3d 1260, 1273 (11th Cir. 2005) (per curiam). "The district court has broad discretion in formulating jury

21

instructions as long as those instructions are a correct statement of the law." *Id.*

"The district court's refusal to incorporate a requested jury instruction will be reversed only if the proffered instruction was substantially correct, the requested instruction was not addressed in charges actually given, and failure to give the instruction seriously impaired the defendant's ability to present an effective defense." *Id.* (citation omitted).

However, in *United States v. Wright*, 392 F.3d 1269 (11th Cir. 2004), we stated, "[i]n order to preserve an objection to jury instructions for appellate review, a party must object before the jury retired, stating distinctly the specific grounds for the objection." *Id.* at 1277 (citation omitted). Where a party fails to object before the jury retires, we review the assignment of error under the "plain error" standard of review. *Id.*

As Merrill's counsel did not object to the court's instruction, our review is for plain error (R 19-226 at 159-60, 300). We find that the court did not commit plain error by not instructing the jury that the Government must prove that Merrill knew and intended to act outside the course of professional medical practice. Merrill proposed the following charge:

> "Legitimate medical purpose," "bounds of medicine," and "usual course of medical care" mean those medical procedures and prescriptions provided by a doctor to cure disease or relieve suffering

of a patient, so long as those medical procedures or prescriptions provided are done by the physician in good faith.

"Not for a legitimate medical purpose" or "outside the bounds of medicine" means when a physician prescribes to, or provides treatment for a patient not to treat a medical condition of the patient, but for some other purpose, such as for financial gain.

R 3-94, at 2. The court issued the following instruction:

A controlled substance is prescribed by a physician in the usual course of professional [practice] and, therefore, lawfully, if the substance is prescribed by him in good faith as part of his medical treatment for the patient in accordance with the standards of medical practice generally recognized and accepted in the United States.

The defendant in this case maintains at all times he acted in good faith and in accordance with the standard of medical practice generally recognized and accepted in the United States in treating his patients.

(R 19-226 at 292).

We have already indicated that a good faith instruction focusing on the physician's subjective intent, like the one proposed by Merrill, "fails to introduce any objective standard by which a physician's prescribing behavior can be judged." *United States v. Williams*, 445 F.3d 1302, 1309 (11th Cir. 2006), *abrogated on other grounds, United States v. Lewis*, No. 06-11876, 2007 WL 2033823 (11th Cir. July 17, 2007) (en banc).

The appropriate focus is not on the subjective intent of the doctor, but rather it rests upon whether the physician prescribes medicine "in accordance with a

23

standard of medical practice generally recognized and accepted in the United States." *Id.* (quoting *United States v. Moore*, 423 U.S. 122, 139 (1975)). In *Williams*, we affirmed a trial court's instruction like the one given here which focuses on whether the doctor acted in accordance with a generally-accepted standard of medical practice. Therefore, we find that the district court neither committed plain error nor abused its discretion in not giving Merrill's proposed jury instruction.

The second issue raised by Merrill with regard to the jury instruction is whether the district court improperly shifted the burden to Defendant with regard to the good faith defense. We find such argument without merit. Here, the district court included in its instructions: "The defendant in this case maintains at all times he acted in good faith and in accordance with standard of medical practice generally recognized and accepted in the United States in treating his patients." (R 19-226 at 292-93).

Merrill argues that this instruction (by using "Defendant maintains") shifted the burden to him to show that he acted in good faith, and that it was the Government's burden to show that the drugs were not prescribed in good faith. However, the court's next instruction shows that it did not shift the burden: "Thus, a medical doctor has violated Section 841 *when the government has proved*

24

*beyond a reasonable doubt* that the doctor's actions were not for legitimate medical purposes in the usual course of professional medical practice or were beyond the bounds of professional medical practice." (R 19-226 at 293) (emphasis added). As such, we find that the court's language did not impermissibly shift the burden to the Defendant and did not constitute plain error.

## E.    Prosecutorial Misconduct

Ordinarily, this court reviews claims of prosecutorial misconduct *de novo* because it is a mixed question of law and fact. *United States v. Eckhardt*, 466 F.3d 938, 947 (11th Cir. 2006). However, with respect to a prosecutor's statements made during closing where the defendant did not raise this objection at trial, we review only for plain error "that is so obvious that failure to correct it would jeopardize the fairness and integrity of the trial." *United States v. Bailey,* 123 F.3d 1381, 1400 (11th Cir. 1997).

"To establish prosecutorial misconduct, (1) the remarks must be improper, and (2) the remarks must prejudicially affect the substantial rights of the defendant." *Eckhardt*, 466 F.3d at 947 (quotation and citation omitted). "A defendant's substantial rights are prejudicially affected when a reasonable probability arises that, but for the remarks, the outcome of the trial would have

25

been different." *Id.* Thus, where there is "sufficient independent evidence of guilt, any error is harmless." *Id.*

Merrill requests a new trial contending that the prosecutor engaged in misconduct in the change of the place of trial, by giving jury instructions on intent, and in proffering the admission of *res gestae* evidence in the form of all Merrill's prescriptions. We have addressed above the propriety of the district court's rulings with respect to these issues, and therefore, they cannot form the basis of a prosecutorial misconduct claim. The only other misconduct claim Merrill raises with any specificity is his allegation that the prosecutor misled the court and the jury with regard to the medical examiner testimony concerning patient Kenneth Noles.

At trial, Dr. Siebert, the medical examiner who performed the autopsy on Kenneth Noles, testified that Fentanyl toxicity could only have occurred by injection and that he found no evidence of injected drugs on the decedent and saw no injection site. He qualified this assertion by stating that it was possible that he could not see an injection site due to a small needle or that the injection was in an uncommon area. When Merrill moved for acquittal with regard to Mr. Noles because there was no evidence of track marks on his arms, Assistant United States Attorney Kunz advised the court that, as he remembered the testimony, Dr. Siebert

did say that he had observed track marks on Kenneth Noles. Later, in his closing, Mr. Kunz repeated this assertion in his summation to the jury. Mr. Kunz also asserted to the jury that "of course" Merrill saw these track marks during physical examinations.

We review *de novo* the alleged prosecutorial misconduct of the prosecutor's statements made to the court at the motion-for-acquittal stage. Applying the two-step test raised in *Eckhardt*, we find that Mr. Kunz's statements to the court during the colloquy on Merrill's motion for a judgment of acquittal were improper. Nonetheless, these statements did not prejudice Merrill as the court expressly stated that the evidence of track marks was irrelevant to its denial of Merrill's motion for a judgment of acquittal on counts relating to Mr. Noles. Further, as stated above, there was sufficient independent evidence of guilt with regard to Mr. Noles' death, specifically his wife's testimony that both she and Mr. Noles were injecting Fentanyl prescribed by Merrill the night of his death, so that any error on the part of Mr. Kunz was harmless. (R 12-219 at 310-14).

Because Merrill did not object to Mr. Kunz's statements to the jury during closing, we review Merrill's claim of prosecutorial misconduct here for plain error. In light of the trial court's cautionary instructions to the jury and the abundance of other independent evidence concerning Mr. Noles' death, we find

27

that the prosecutor's misstatements during closing with regard to the track marks were not plain error so obvious that the court's failure to correct it, *sua sponte*, jeopardized the fairness and integrity of the trial.

## F.  Ineffective Assistance of Counsel

Next, Merrill contends that he was denied effective assistance of counsel at trial for several reasons.  We have held that "[e]xcept in the rare instance when the record is sufficiently developed, we will not address claims for ineffective assistance of counsel on direct appeal." *United States v. Verbitskaya*, 406 F.3d 1324, 1337 (11th Cir. 2005) (citing *United States v. Tyndale,* 209 F.3d 1292, 1294 (11th Cir. 2000)).  Instead, "[a]n ineffective assistance of counsel claim is properly raised in a collateral attack on the conviction under 28 U.S.C. § 2255." *United States v. Butler,* 41 F.3d 1435, 1437 n.1 (11th Cir. 1995).  We conclude the record below is not sufficiently developed to evaluate Merrill's ineffective assistance of counsel claim at this time.  Thus, the claim would be more appropriately addressed in a section 2255 motion.

## G.  Dismissal of Juror

Finally, Merrill objects to the court's inadvertent replacement of a juror with an alternate.  Merrill claims that this replacement violated Federal Rule of Criminal Procedure 24(c)(3).  We evaluate such a claim under the *de novo*

standard of review. *United States. v. Brewer*, 199 F.3d 1283, 1286 (11th Cir. 2000).

The trial court replaced a juror and sent an alternate out for deliberations with the other jury members because the court mistakenly believed the former was an alternate. The jury went to deliberate. Soon thereafter, the court discovered the error and discussed the error with counsel for both parties. During this colloquy defense counsel indicated a desire to have the original juror reinstated while the Government did not; neither party mentioned the race of either juror. Finding no prejudice to Merrill, the court decided not to reinstate the mistakenly-dismissed juror. Merrill now claims that the replaced juror was African-American, and the alternate seated in her place was Caucasian.[12] For this reason Merrill contends that he is entitled to a new trial.

Federal Rule of Criminal Procedure 24(c) provides that "[t]he court may impanel up to 6 alternate jurors to replace any jurors who are unable to perform or who are disqualified from performing their duties. . . . Alternate jurors replace jurors in the same sequence in which the alternates were selected."

---

[12]Although Merrill's brief contends that the dismissed juror was African-American and the alternate juror was white with less education and a "perceived bias and leaning for the prosecution on the petit jury," the citation to the record provided by Merrill provides no information as to the race of either juror nor any evidence at all of any perceived bias.

We find that when the district court replaced a juror with an alternate for no reason, it erred and violated Rule 24(c). The real question before the court is whether this erroneous replacement constitutes reversible error or merely harmless error.

We have "explicitly rejected a rule of per se reversal for Rule 24(c) violations." *Brewer*, 199 F.3d at 1286 (citing *United States v. Acevedo*, 141 F.3d 1421, 1423 (11th Cir. 1998)). "Instead, reversal is required only if there is a reasonable possibility that the district court's violation of Rule 24(c) actually prejudiced the defendant by tainting the jury's final verdict." *Id.* at 1286-87 (citing *United States v. Register*, 182 F.3d 820, 842 (11th Cir. 1999); *United States v. Bendek,* 146 F.3d 1326, 1328 (11th Cir. 1998) (per curiam)).

In *Brewer*, the district court randomly selected two of fourteen jurors to be removed as alternates immediately prior to the jurors retiring to deliberate. We found that this random method of designating which jurors would be alternates violated the "explicit command" of Rule 24(c). *Brewer*, 199 F.3d at 1286. The plaintiff contended that he was prejudiced "because one of the jurors who was designated as an alternate was black, the district court's method diluted black representation on the jury." *Id.* at 1287. We found that this "unsupported assertion, without any reference to the racial makeup of the jury panel that

30

convicted the defendants, falls far short of the required showing of a reasonable possibility that the district court's violation of Rule 24(c) *actually* prejudiced the defendants by affecting the jury's final verdict." *Id.* (emphasis in original).

Here, Merrill makes a similarly unsupported assertion. He claims that he was denied a fair cross section of the community by the judge's inadvertent replacement of a juror with an alternate. Like the defendants in *Brewer*, however, Merrill has made no reference to the racial makeup of the jury panel. For this reason we find, as we did in *Brewer*, that Merrill's unsubstantiated allegation does not show "a reasonable possibility that the district court's violation of Rule 24(c) *actually* prejudiced the [defendant] by affecting the jury's final verdict."

### III. CONCLUSION

As stated above, we find that 1) there was sufficient evidence at trial to support counts in the indictment charging Merrill with providing controlled substances to patients which resulted in their deaths; 2) the trial court's admission of evidence in the form of prescriptions of Merrill's patients who were not the subject of any count in the indictment was not an abuse of discretion; 3) the trial court did not abuse its discretion in moving this case from Panama City to Pensacola, Florida; 4) the trial court did not wrongly instruct the jury; 5) Assistant United States Attorney Kunz did not commit prosecutorial misconduct so

31

prejudicial as to warrant a new trial; 6) the record below is not sufficiently developed to evaluate Merrill's ineffective assistance of counsel claim; and 7) Merrill has not shown prejudice resulting from the replacement of a juror with an alternate.

For all of these reasons, we **AFFIRM** the district court.

# EXHIBIT 1

Example of Tab 1 of the Summary for Two Patients

| Patient | Rx # | Write Date | Fill Date | Qty | C/NC | Drug Name | Strength | Total MG | Pharmacy | |
|---|---|---|---|---|---|---|---|---|---|---|
| BP | 692413 | 6/21/02 | 6/21/02 | 60 | NC | Doxepin | 150 | 9000 | Lanier Pharmacy | |
| BP | 692415 | 6/21/02 | 6/21/02 | 100 | C | Alprazolam | 2 | 200 | Lanier Pharmacy | |
| BP | 692416 | 6/21/02 | 6/21/02 | 60 | NC | Flurazepam | 30 | 900 | Lanier Pharmacy | |
| BP | 692417 | 6/21/02 | 6/21/02 | 60 | C | Phentermine | 30 | 1800 | Lanier Pharmacy | |
| BP | 692419 | 6/21/02 | 6/21/02 | 120 | C | Oxycontin | 40 | 4800 | Lanier Pharmacy | |
| BP | 692421 | 6/21/02 | 6/21/02 | 100 | C | Carisoprodol | 350 | 35000 | Lanier Pharmacy | |
| BP | 692422 | 6/21/02 | 6/21/02 | 100 | C | Hydrocodone/Apap | 10/500 | 1000 | Lanier Pharmacy | |
| BP | 689549 | 5/23/02 | 5/23/02 | 8 | NC | Prozac | 90 | 720 | Lanier Pharmacy | |
| BP | 689550 | 5/23/02 | 5/23/02 | 100 | C | Carisoprodol | 350 | 35000 | Lanier Pharmacy | |
| BP | 689552 | 5/23/02 | 5/23/02 | 100 | C | Hydrocodone/Apap | 10/500 | 1000 | Lanier Pharmacy | |
| BP | 689554 | 5/23/02 | 5/23/02 | 100 | C | Alprazolam | 2 | 200 | Lanier Pharmacy | |
| BP | 689556 | | 5/23/02 | 60 | C | Flurazepam | 30 | 1800 | Lanier Pharmacy | |
| BP | 689557 | 5/23/02 | 5/23/02 | 30 | C | Melfiat | 105 | 3150 | Lanier Pharmacy | |
| BP | 689558 | 5/23/02 | 5/23/02 | 120 | C | Oxycontin | 40 | 4800 | Lanier Pharmacy | |
| BP | | | 5/23/02 | 30 | NC | Prevacid | 30 | 900 | Lanier Pharmacy | |
| BP | 3142566 | | 4/23/02 | 100 | C | Hydrocodone/Apap | 10/500 | 1000 | Eckerd Drugs 3198 | |
| BP | 686632 | 4/23/02 | 4/23/02 | 60 | C | Oxycontin | 80 | 4800 | Lanier Pharmacy | |
| BP | 686633 | 4/23/02 | 4/23/02 | 60 | NC | Doxepin | 150 | 9000 | Lanier Pharmacy | |
| BP | 686634 | 4/23/02 | 4/23/02 | 100 | C | Alprazolam | 2 | 200 | Lanier Pharmacy | |
| BP | 686636 | 4/23/02 | 4/23/02 | 60 | NC | Flurazepam | 30 | 900 | Lanier Pharmacy | |
| BP | 686637 | 4/23/02 | 4/23/02 | 30 | C | Melfiat | 105 | 3150 | Lanier Pharmacy | |
| BP | 683588 | 3/22/02 | 3/22/02 | 473 | C | Tussionex Pennkinetic Susp Mpi | 10 | 4730 | Lanier Pharmacy | |
| BP | 683590 | 3/22/02 | 3/22/02 | 100 | C | Oxycontin | 40 | 4000 | Lanier Pharmacy | |
| BP | 683593 | 3/22/02 | 3/22/02 | 100 | C | Carisoprodol | 350 | 35000 | Lanier Pharmacy | |
| BP | 683594 | 3/22/02 | 3/22/02 | 100 | C | Hydrocodone/Apap | 10/500 | 1000 | Lanier Pharmacy | |
| BP | 683596 | 3/22/02 | 3/22/02 | 100 | C | Alprazolam | 2 | 200 | Lanier Pharmacy | |
| BP | 683597 | | 3/22/02 | 60 | C | Flurazepam | 30 | 1800 | Lanier Pharmacy | |
| BP | 683598 | 3/22/02 | 3/22/02 | 60 | C | Phentermine | 30 | 1800 | Lanier Pharmacy | |
| BP | 3811551 | 2/15/02 | 2/16/02 | 100 | C | Hydrocodone/Apap | 10/500 | 1000 | Eckerd Drugs 2632 | |
| BP | 3811552 | 2/15/02 | 2/16/02 | 473 | C | Tussionex | 10 | 4730 | Eckerd Drugs 2632 | |
| BP | 6811549 | 2/15/02 | 2/16/02 | 120 | C | Carisoprodol | 350 | 42000 | Eckerd Drugs 2632 | |
| BP | 680161 | 2/15/02 | 2/15/02 | 120 | C | Oxycontin | 40 | 4800 | Lanier Pharmacy | |

33

| Patient | Rx # | Write Date | Fill Date | Qty | C/NC | Drug Name | Strength | Total MG | Pharmacy |
|---|---|---|---|---|---|---|---|---|---|
| BP | 680167 | 2/15/02 | 2/15/02 | 105 | C | Alprazolam | 2 | 210 | Lanier Pharmacy |
| BP | 680168 | 2/15/02 | 2/15/02 | 70 | C | Triazolam | 25 | 1750 | Lanier Pharmacy |
| BP | 2805707 | 1/18/02 | 1/21/02 | 60 | C | Oxycontin | 40 | 2400 | Eckerd Drugs 2632 |
| BP | 3805706 | 1/18/02 | 1/21/02 | 480 | C | Tussionex | 10 | 4800 | Eckerd Drugs 2632 |
| BP | 3805711 | 1/21/02 | 1/21/02 | 100 | C | Hydrocodone/Apap | 10/500 | 1000 | Eckerd Drugs 2632 |
| BP | 6805710 | 1/18/02 | 1/21/02 | 100 | C | Carisoprodol 350 | | 35000 | Eckerd Drugs 2632 |
| BP | 671997 | | 11/20/01 | 60 | C | Oxycontin | 40 | 2400 | Lanier Pharmacy |
| BP | 672003 | | 11/20/01 | 100 | C | Hydrocodone/Apap | 10/500 | 1000 | Lanier Pharmacy |
| BP | 672005 | | 11/20/01 | 240 | C | Tussionex Pennkinetic Susp Mpi | 10 | 2400 | Lanier Pharmacy |
| BP | 664277 | | 8/24/01 | 60 | C | Oxycontin | 40 | 2400 | Lanier Pharmacy |
| BP | 664281 | | 8/24/01 | 240 | C | Tussionex Pennkinetic Susp Mpi | 10 | 2400 | Lanier Pharmacy |
| BP | 664282 | | 8/24/01 | 96 | C | Hydrocodone/Apap | 10/500 | 960 | Lanier Pharmacy |
| BP | 661184 | | 7/27/01 | 473 | C | Tussionex Pennkinetic Susp Mpi | 10 | 4730 | Lanier Pharmacy |
| BP | 661182 | | 7/20/01 | 100 | C | Hydrocodone/Apap | 10/500 | 1000 | Lanier Pharmacy |
| BP | 661186 | | 7/20/01 | 60 | C | Oxycontin | 40 | 2400 | Lanier Pharmacy |
| Patient | Rx # | Write Date | Fill Date | Qty | C/NC | Drug Name | Strength | Total MG | Pharmacy |
| BB | 3951424 | | 5/13/04 | 150 | C | Hydrocodone/Apap | 10/500 | 1500 | Eckerd Drugs 2632 |
| BB | 3948990 | | 4/20/04 | 60 | C | Hydrocodone/Apap | 10/500 | 600 | Eckerd Drugs 2632 |
| BB | 503196 | 4/12/04 | 4/12/04 | 120 | C | Diazepam | 10 | 1200 | Springfield City Drugs |
| BB | 502813 | 4/5/04 | 4/5/04 | 150 | C | Hydrocodone/Apap | 10/650 | 1500 | Springfield City Drugs |
| BB | 2225579 | 3/8/04 | 3/15/04 | 10 | C | Duragesic (Mcg) | 100 | 1000 | Eckerd Drugs 3619 |
| BB | 854786 | 3/8/04 | 3/8/04 | 120 | C | Diazepam | 10 | 1200 | Lanier Pharmacy |
| BB | 854787 | 3/8/04 | 3/8/04 | 150 | C | Hydrocodone/Apap | 10/650 | 1500 | Lanier Pharmacy |
| BB | 851847 | 2/10/04 | 2/10/04 | 150 | C | Hydrocodone/Apap | 10/650 | 1500 | Lanier Pharmacy |
| BB | 851849 | 2/10/04 | 2/10/04 | 120 | C | Diazepam | 10 | 1200 | Lanier Pharmacy |
| BB | 4527552 | 1/22/04 | 1/22/04 | 37 | C | Hydrocodone/Apap | 10/650 | 370 | Wal-Mart 1032 |
| BB | 4527553 | 1/22/04 | 1/22/04 | 30 | C | Diazepam | 10 | 300 | Wal-Mart 1032 |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| BB | 3936046 | 1/12/04 | 1/17/04 | 38 | C | Hydrocodone/Apap | 10/650 | 380 | Eckerd Drugs 2632 | |
| BB | 4936047 | 1/12/04 | 1/17/04 | 30 | C | Diazepam | 10 | 300 | Eckerd Drugs 2632 | |
| BB | 424303 | 1/13/04 | 1/13/04 | 60 | C | Diazepam | 10 | 600 | Medicine Shoppe | |
| BB | Not Listed | | 1/13/04 | 75 | C | Hydrocodone/Apap | 10/650 | 750 | Medicine Shoppe | |
| BB | 3214699 | 12/11/03 | 12/22/03 | 75 | C | Hydrocodone/Apap | 10/650 | 750 | Eckerd Drugs 3619 | |
| BB | 4214700 | 12/11/03 | 12/22/03 | 60 | C | Diazepam | 10 | 600 | Eckerd Drugs 3619 | |
| BB | 4451516 | 12/11/03 | 12/12/03 | 75 | C | Hydrocodone/Apap | 10/650 | 750 | KMART 3355 | |
| BB | 4451517 | 12/11/03 | 12/12/03 | 60 | C | Diazepam | 10 | 600 | KMART 3355 | |
| BB | 841812 | 11/10/03 | 11/10/03 | 150 | C | Hydrocodone/Apap | 10/500 | 1500 | Lanier Pharmacy | |
| BB | 841813 | 11/10/03 | 11/10/03 | 120 | C | Diazepam | 10 | 1200 | Lanier Pharmacy | |
| BB | 838679 | 10/10/03 | 10/10/03 | 5 | C | Duragesic (Mcg) | 50 | 250 | Lanier Pharmacy | |
| BB | 838685 | 10/10/03 | 10/10/03 | 150 | C | Hydrocodone/Apap | 10/500 | 1500 | Lanier Pharmacy | |
| BB | 838687 | 10/10/03 | 10/10/03 | 120 | C | Diazepam | 10 | 1200 | Lanier Pharmacy | |
| BB | 4827607 | | 9/9/03 | 150 | C | Hydrocodone/Apap | 10 | 1500 | Campbell City Eckerd Drug | |
| BB | 4827608 | | 9/9/03 | 120 | C | Diazepam | 10 | 1200 | Campbell City Eckerd Drug | |
| BB | 4824857 | | 8/8/03 | 150 | C | Hydrocodone/Apap | 10 | 1500 | Campbell City Eckerd Drug | |
| BB | 4824858 | | 8/8/03 | 120 | C | Diazepam | 10 | 1200 | Campbell City Eckerd Drug | |
| BB | 4822419 | | 7/9/03 | 150 | C | Hydrocodone/Apap | 10 | 1500 | Campbell City Eckerd Drug | |
| BB | 4822420 | | 7/9/03 | 120 | C | Diazepam | 10 | 1200 | Campbell City Eckerd Drug | |
| BB | 4820209 | | 6/12/03 | 120 | C | Diazepam | 10 | 1200 | Campbell City Eckerd Drug | |
| BB | 4820210 | | 6/12/03 | 150 | C | Hydrocodone/Apap | 10 | 1500 | Campbell City Eckerd Drug | |
| BB | 4817814 | | 5/13/03 | 150 | C | Hydrocodone/Apap | 10 | 1500 | Campbell City Eckerd Drug | |
| BB | 4817815 | | 5/13/03 | 120 | C | Diazepam | 10 | 1200 | Campbell City Eckerd Drug | |

| BB | Rx | | | Qty | C | Drug | Strength | Total | Pharmacy |
|----|------|---------|----------|-----|---|------------------|--------|------|--------------------------|
| BB | 4814882 | | 4/10/03 | 150 | C | Hydrocodone/Apap | 10 | 1500 | Campbell City Eckerd Drug |
| BB | 4814883 | | 4/10/03 | 120 | C | Diazepam | 10 | 1200 | Campbell City Eckerd Drug |
| BB | 4519378 | | 3/18/03 | 60 | C | Diazepam | 10 | 600 | Wal-Mart 1032 |
| BB | 4519377 | 3/10/03 | 3/13/03 | 75 | C | Hydrocodone/Apap | 10/500 | 750 | Wal-Mart 1032 |
| BB | 4519377 | | 3/13/03 | 0 | C | Hydrocodone/Apap | 10/500 | 0 | Wal-Mart 1032 |
| BB | 4519377 | | 3/10/03 | 75 | C | Hydrocodone/Apap | 10/500 | 750 | Wal-Mart 1032 |
| BB | 4519378 | 3/10/03 | 3/10/03 | 60 | C | Diazepam | 10 | 600 | Wal-Mart 1032 |
| BB | 4519196 | 3/4/03 | 3/4/03 | 35 | C | Hydrocodone/Apap | 10/500 | 350 | Wal-Mart 1032 |
| BB | 4519197 | 3/4/03 | 3/4/03 | 21 | C | Diazepam | 10 | 210 | Wal-Mart 1032 |
| BB | 4808478 | | 1/31/03 | 150 | C | Hydrocodone/Apap | 10 | 1500 | Campbell City Eckerd Drug |
| BB | 4808479 | | 1/31/03 | 100 | C | Diazepam | 10 | 1000 | Campbell City Eckerd Drug |
| BB | 4518221 | 1/24/03 | 1/24/03 | 35 | C | Hydrocodone/Apap | 10/500 | 350 | Wal-Mart 1032 |
| BB | 4518222 | 1/24/03 | 1/24/03 | 21 | C | Diazepam | 10 | 210 | Wal-Mart 1032 |
| BB | 4517432 | 12/20/02 | 12/20/02 | 75 | C | Hydrocodone/Apap | 10/500 | 750 | Wal-Mart 1032 |
| BB | 4517434 | 12/20/02 | 12/20/02 | 50 | C | Diazepam | 10 | 500 | Wal-Mart 1032 |
| BB | 4804651 | | 12/17/02 | 75 | C | Hydrocodone/Apap | 10 | 750 | Campbell City Eckerd Drug |
| BB | 4804652 | | 12/17/02 | 50 | C | Diazepam | 10 | 500 | Campbell City Eckerd Drug |
| BB | 4478989 | 10/10/02 | 10/10/02 | 75 | C | Hydrocodone/Apap | 10/500 | 750 | Wal-Mart 1207 |
| BB | 4478990 | 10/10/02 | 10/10/02 | 50 | C | Diazepam | 10 | 500 | Wal-Mart 1207 |
| BB | 4798474 | | 10/2/02 | 50 | C | Diazepam | 10 | 500 | Campbell City Eckerd Drug |
| BB | 4798475 | | 10/2/02 | 75 | C | Hydrocodone/Apap | 10 | 750 | Campbell City Eckerd Drug |
| BB | 4842773 | | 9/27/02 | 40 | C | Clonazepam | 1 | 40 | Eckerd Drugs 2632 |
| BB | 4444463 | 9/19/02 | 9/19/02 | 150 | C | Hydrocodone/Apap | 10/500 | 1500 | KMART 3355 |
| BB | 4842773 | | 9/18/02 | 10 | C | Clonazepam | 1 | 10 | Eckerd Drugs 2632 |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| BB | 697757 | | 9/13/02 | 150 | C | Hydrocodone/Apap | 10/500 | 1500 | | Lanier Pharmacy |
| BB | 4478282 | 9/9/02 | 9/9/02 | 50 | C | Diazepam | 10 | 500 | Wal-Mart 1207 | |
| BB | 697756 | 8/19/02 | 8/19/02 | 50 | C | Diazepam | 10 | 500 | Lanier Pharmacy | |
| BB | 697757 | 8/19/02 | 8/19/02 | 150 | C | Hydrocodone/Apap | 10/650 | 1500 | | Lanier Pharmacy |
| BB | 697757 | | 8/19/02 | 150 | C | Hydrocodone/Apap | 10/500 | 1500 | | Lanier Pharmacy |
| BB | 4842773 | | 8/13/02 | 30 | C | Clonazepam 1 | | 30 | Eckerd Drugs 2632 | |
| BB | 4842773 | | 8/6/02 | 30 | C | Clonazepam 1 | | 30 | Eckerd Drugs 2632 | |
| BB | 4842773 | | 8/1/02 | 30 | C | Clonazepam 1 | | 30 | Eckerd Drugs 2632 | |
| BB | 4842773 | 7/17/02 | 7/17/02 | 100 | C | Carisoprodol 350 | | 35000 | Eckerd Drugs | |
| BB | 694643 | 7/17/02 | 7/17/02 | 150 | C | Hydrocodone/Apap | 10/500 | 1500 | | Lanier Pharmacy |
| BB | 694643 | | 7/17/02 | 150 | C | Hydrocodone/Apap | 10/500 | 1500 | | Lanier Pharmacy |
| BB | 691950 | 6/17/02 | 6/17/02 | 100 | C | Diazepam | 10 | 1000 | Lanier Pharmacy | |
| BB | 691951 | 6/17/02 | 6/17/02 | 150 | C | Hydrocodone/Apap | 10/500 | 1500 | | Lanier Pharmacy |
| BB | 691951 | | 6/17/02 | 150 | C | Hydrocodone/Apap | 10/500 | 1500 | | Lanier Pharmacy |
| BB | 689039 | 5/17/02 | 5/17/02 | 100 | C | Diazepam | 10 | 1000 | Lanier Pharmacy | |
| BB | 689042 | 5/17/02 | 5/17/02 | 150 | C | Hydrocodone/Apap | 10/500 | 1500 | | Lanier Pharmacy |
| BB | 393436 | | 5/11/02 | 60 | C | Diazepam | 10 | 600 | Walgreens 4847 | |
| BB | 685758 | 4/15/02 | 4/15/02 | 30 | C | Ambien | 10 | 300 | Lanier Pharmacy | |
| BB | 685758 | 4/15/02 | 4/15/02 | 100 | C | Diazepam | 10 | 1000 | Lanier Pharmacy | |
| BB | 685761 | 4/15/02 | 4/15/02 | 150 | C | Hydrocodone/Apap | 10/650 | 1500 | | Lanier Pharmacy |
| BB | 4510723 | 3/14/02 | 3/14/02 | 100 | C | Diazepam | 10 | 1000 | Wal-Mart 1032 | |
| BB | 4510724 | 3/14/02 | 3/14/02 | 30 | C | Ambien | 10 | 300 | Wal-Mart 1032 | |
| BB | 4510725 | 3/14/02 | 3/14/02 | 120 | C | Hydrocodone/Apap | 10/650 | 1200 | | Wal-Mart 1032 |
| BB | 401619 | 3/13/02 | 3/13/02 | 10 | C | Hydrocodone/Apap | 10/500 | 100 | | Walgreens 4847 |
| BB | 393436 | | 2/5/02 | 40 | C | Diazepam | 10 | 400 | Walgreens 4847 | |
| BB | 393075 | | 2/4/02 | 60 | C | Endocet | 10/650 | 600 | Walgreens 4847 | |

Unless otherwise indicated all drug descriptions were drawn from the **Physicians' Desk Reference (Thomson 61st ed. 2007) and the list of controlled substances under the Controlled Substances Act, 21 U.S.C. § 801, found at 21 CFR § 813.**

Alprazolam: a benzodiazepine designed to treat anxiety; schedule IV   Hydrocodone/Apap: opiate, schedule II

Ambien: a hypnotic used to treat sleeplessness; schedule IV              Melfiat: an uncommon stimulant or diet medication (R 13-220, at 33); schedule III

Carisoprodol: a non-controlled muscle relaxant; (R 13-220, at 35)       Oxycontin: a controlled release form of the opiad oxycodone; schedule II


Clonazepam: a benzodiazepine designed to treat anxiety; schedule IV   Phentermine: a weight lose drug; schedule IV

Diazepam: a benzodiazepine derivative often referred to as valium; schedule IV    Prevacid:  a non-controlled medication to inhibit gastric acid secretion


Doxepin: non-controlled anti-depressant          Prozac: non-controlled anti-depressant; (R 13-220, at 34)

Duragesic (Mcg): mechanism to deliver fentanyl, an opiate, through the skin; schedule II        Triazolam: schedule IV

Endocet: an oxycodone intended to treat pain; schedule II  Tussionex: hydrocodone used to treat upper respiratory symptoms; schedule III


Flurazepam: benzodiazepine used to treat insomnia; schedule IV