[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JUNE 10, 2008
THOMAS K. KAHN
CLERK

_____

No. 07-13697
Non-Argument Calendar

_____

D. C. Docket No. 06-00035-CR-1-MMP

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

BRUCE DAVID ADAMS,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Florida

_____

**(June 10, 2008)**

Before CARNES, BARKETT and KRAVITCH, Circuit Judges.

PER CURIAM:

Bruce David Adams appeals his convictions and sentence for (1) conspiracy

to distribute and possess with intent to distribute more than 5 kilograms of cocaine, 21 U.S.C. §§ 841(a)(1) and (b)(1)(A)(ii), 846 (Count 1); and (2) possession of a firearm in furtherance of a drug trafficking crime, 18 U.S.C. §§ 924(c)(1)(A) (Count 2).

## Background

Adams was indicted for the above charges. At trial, the government noted during its opening statement that Adams "is the president of a motorcycle gang known as the Hell's Lovers." Adams objected to the government's reference to Hell's Lovers being a "motorcycle gang." Adams did not object to any other prosecutorial statement relevant to this appeal.

At trial, a confidential informant for the government testified that he went to the Hell's Lovers' "clubhouse" with a third party to purchase cocaine. This clubhouse was located inside a business that Adams owned and operated. When the informant arrived at the clubhouse, Adams "c[a]me walking in and took over the deal, and [the informant] purchased the drugs from him." The informant purchased cocaine from Adams on three additional occasions at the clubhouse; the quantities of which ranged "from an ounce up to a pound to a kilo[gram]." When the government asked if the informant knew "the Hell's Lovers motorcycle gang," the informant responded that "[t]hey are a motorcycle club."

2

Investigators also made nine controlled cocaine purchases from Adams's co-defendant and girlfriend, Betty Jo Rains. Rains and Adams lived together, although Adams still maintained a home with his wife Donna Adams. Officers executed a search warrant at the home that Rains shared with Adams, and they uncovered 122.3 grams of cocaine, $24,716 in cash, 11 firearms, baggies, and digital scales. After her arrest, Rains informed investigators that Juan Baez had supplied her with cocaine for several years, and she agreed to set up a controlled purchase of cocaine from Baez. Officers intercepted Baez en route to the controlled purchase and found 600 grams of cocaine in his possession. Rains testified that she had worked with Adams, among others, in purchasing cocaine from Baez, and she had also "fronted" Adams cocaine to sell. Baez testified that Adams had accompanied Rains when she purchased cocaine from Baez, and that Adams "counted the money and handled the cocaine." Baez estimated that he had sold at least 15 kilograms of cocaine to them in the two years prior to their arrests.

During closing arguments, defense counsel reminded the jury of the government's "motorcycle gang" remark and argued that "[t]here is no evidence of any gang." Counsel also observed that there was a disagreement over whether Adams "was a conspirator or . . . [whether] this a buyer/seller relationship." Defense counsel argued that if the jury found that Adams's and Rains's

3

relationship "was simply that of a buyer/seller, then that does not make him a conspirator also." Further, counsel reiterated a previous argument that "the government had overcharged [Adams] in this case." In that regard, counsel argued that Adams did not possess firearms in furtherance of a large-scale narcotics operation. Rather, "[i]t was merely possession in proximity to small amounts of cocaine that Mr. Adams was selling."

On rebuttal, the government stated that "[i]f [the jury] want[s] to call this a motorcycle club or a motorcycle gang, [the jury] can call it anything [it] want[s], but it doesn't change the fact that [Adams] is guilty of these two crimes." The government also requested that the jury not "get hung up on" the buyer-seller relationship. The government then described a one-time buy-sell transaction that would not support a conspiracy charge and stated that "[t]here's no evidence that this was simply a buyer/seller relationship . . . ." Moreover, the government characterized Adams's "overcharged" argument as "completely improper." The government stated that "[i]f anything, [Adams] was undercharged. What about money laundering, bank fraud? What about all of these financial crimes? We are not here to decide if he was undercharged, overcharged, only if he was guilty of what he is charged with." Adams did not object to the prosecutor's statements related to whether Adams was overcharged.

At the conclusion of the parties' closing arguments, the court instructed the jury that "anything the lawyers say is not evidence . . . and what the lawyers say is not binding upon [the jury]." The court had also instructed the jury as to the permissible use and consideration of the lawyers' arguments before both the opening statements and closing arguments.

The jury found Adams guilty on both counts.

Before sentencing, the probation officer prepared a pre-sentence investigation report (PSI). After adding an enhancement because Adams threatened to kill two police officers involved in his arrest and because he had made over 300 phone calls to Rains from prison regarding her upcoming testimony, the probation officer determined the applicable Guidelines range was 188-235 months imprisonment. The statutory range of imprisonment on Count 1 was 10 years to life.

At sentencing, the court heard testimony concerning Adams's communications with Rains, and the parties offered their arguments as to the sentence that should be imposed. The court accepted the Guidelines calculations in the PSI, and the judge stated that "the evidence clearly shows that [Adams] was fully aware of the members of the conspiracy and their roles in it, his role in it, [and] the amount of drugs involved in the conspiracy." The court then sentenced

Adams to 211 months imprisonment on Count 1, stating that "[t]his is midway of the guideline range" and "is appropriate under the circumstances." The court sentenced Adams to 60 months imprisonment on Count 2, to run consecutively, as required by statute. The court then informed the parties that "[in] reaching the sentence I have considered all of the guidelines and policy statements under 18 U.S. Code 3553(a)."

On appeal, Adams challenges three statements the government made during its opening and closing remarks and also challenges his sentence.

**Discussion**

**1. Prosecutorial Misconduct**

Adams contends that he was denied a fair trial and due process because the government made three comments that were allegedly irrelevant and prejudicial. Adams asserts that the prosecutor improperly (1) referred to Hell's Lovers as a "gang" instead of a "club"; (2) told the jury not to "get hung up on" the court's instructions on the distinction between a conspiracy and a buyer-seller relationship; and (3) listed other crimes with which it could have charged Adams, noting that he was "undercharged." Adams argues in the alternative that if these errors alone did not violate his right to a fair trial, the cumulative effect of these errors did.

We review claims of prosecutorial misconduct de novo. United States v. Merrill, 513 F.3d 1293, 1306 (11th Cir. 2008). With respect to a prosecutor's

statements made during closing where the defendant did not raise this objection at trial, however, we review only for plain error. Id. at 1306-07. To establish prosecutorial misconduct, (1) the prosecutor's remarks must be improper, and (2) the remarks must prejudicially affect the substantial rights of the defendant. Id. at 1307. "A defendant's substantial rights are prejudicially affected when a reasonable probability arises that, but for the remarks, the outcome of the trial would have been different." Id. But "[w]hen the record contains sufficient independent evidence of guilt, any error is harmless." Id. We make this determination in the context of the entire trial and in light of any curative instruction. United States v. Wilson, 149 F.3d 1298, 1301 (11th Cir. 1998) (quotations and citations omitted).

Because Adams objected to the prosecutor's characterization of Hell's Lovers as a "gang," this court reviews that prosecutorial misconduct claim de novo. Adams, however, failed to object to either the "undercharged" remark or the government's argument concerning the distinction between a buyer-seller relationship and a conspiracy. We, therefore, review those claims of prosecutorial misconduct under the plain error standard.

We find Adams's claim of prosecutorial misconduct without merit. Even if—after considering the context in which the comments were made—we were to

deem one or more of the statements improper[5], any error would be harmless because of the great weight of evidence against Adams. The evidence showed that a confidential informant visited the Hell's Lovers clubhouse on Adams's business's property several times and on multiple occasions purchased cocaine directly from Adams. The quantity of the drugs ranged from an "an ounce up to a pound to a kilo." The government also showed that it made nine controlled buys from Rains, Adams's girlfriend and co-defendant. A search of Rains's home, where Adams also resided, uncovered 122.3 grams of cocaine, $24,716 in cash, 11 loaded firearms, baggies, and digital scales. After her arrest, Rains indicated that Baez had supplied her with the cocaine for several years, and Rains cooperated by setting up a controlled purchase from Baez that yielded 600 grams of cocaine. Moreover, Rains informed the government that Adams was one of the individuals with whom she worked to acquire cocaine from Baez. Baez corroborated this information, and he estimated that he sold them at least 15 kilograms of cocaine in the two years prior to their arrests. Rains further testified that she had "fronted" Adams cocaine to sell. Thus, even if any of the prosecutor's statements were improper, Adams has not shown that, but for the prosecutor's remarks, there is a reasonable probability that the outcome of the trial would have been different.

---

[5] We need not address whether the statements are improper.

8

Finally, we are unpersuaded that the cumulative effect of any harmless error(s) warrant a new trial. Even if a prosecutor's comments are inappropriate, reversal is only warranted if the entire trial is so replete with errors that the defendant was denied a fair trial. United States v. Eckhardt, 466 F.3d 938, 947 (11th Cir. 2006). Adams's trial was not "so replete with errors" that he was denied a fair trial.

## 2. Sentence

Adams further argues that his sentence is procedurally unreasonable because the court failed to state a reason for imposing a sentence in the middle of the Guidelines range. Further, Adams contends that the court erred by failing to specifically address the sentencing factors set forth in 18 U.S.C. § 3553(a) and failing to find that it had arrived at a sentence that was "sufficient but not greater than necessary" as is required by § 3553.

We review the district court's imposition of a sentence under the abuse-of-discretion standard. Gall v. U.S., 552 U.S. ____, 128 S.Ct. 586, 597 (2007). The sentence must be both procedurally and substantively reasonable. Id. When reviewing the sentence for procedural reasonableness, this court must "ensure that the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines

9

as mandatory, failing to consider the [18 U.S.C.] § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence." Id. Under § 3553(c)(1), "[t]he court, at the time of sentencing, shall state in open court the reasons for its imposition of the particular sentence, and, if the sentence . . . is of the kind, and within the [Guidelines] range . . . and that range exceeds 24 months, the reason for imposing a sentence at a particular point within the range . . . ." 18 U.S.C. § 3553(c)(1). The Supreme Court recently provided that, to comply with § 3553(c)'s requirement of a statement of reasons, "[t]he sentencing judge should set forth enough to satisfy the appellate court that he has considered the parties' arguments and has a reasoned basis for exercising his own legal decision-making authority." Rita v. United States, __ U.S. __, 127 S.Ct. 2456, 2468 (2007). The judge does not need to specifically address each 3553(a) factor. United States v. Bonilla, 463 F.3d 1176, 1181 (11th Cir. 2006). Instead, an explicit acknowledgment that the district court has considered the defendant's arguments and the § 3553(a) factors will suffice. United States v. Scott, 426 F.3d 1324, 1329-30 (11th Cir. 2005). In reviewing the sentence, we review the transcript and consider the circumstances within which the district court made its decision. See Rita, 127 S.Ct. at 2469. The defendant bears the burden on appeal of establishing that the sentence is unreasonable. United States v.

10

Bohannon, 476 F.3d 1246, 1253 (11th Cir. 2007).

Here, Adams has failed to persuade us that his sentence was procedurally unreasonable. Just before the court announced Adams's sentence, the court stated that "the evidence clearly shows that [Adams] was fully aware of the members of the conspiracy and their roles in it, his role in it, [and] the amount of drugs involved in the conspiracy." Moreover, Adams was found with several firearms and had been involved in a criminal conspiracy for some time involving over 15 kilograms of cocaine. The court expressly stated that it had considered the information in the PSI, the guidelines, and the § 3553(a) factors, and it concluded that a sentence in the middle of the Guidelines range was appropriate. We cannot say that a sentence in the middle of the Guidelines range is procedurally unreasonable in this case.

Accordingly, we **AFFIRM**.