**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Tom CRUTCHFIELD, Penny Crutchfield,**
**Defendants–Appellants.**

**No. 92–3211.**

United States Court of Appeals,
Eleventh Circuit.

July 26, 1994.

James E. Felman, Kynes & Markman, P.A., Tampa, FL, for appellants.

Michael L. Rubinstein, Tamra Phipps, Asst. U.S. Atty., Tampa, FL, for appellee.

Before BLACK, Circuit Judge, MORGAN and FAY, Senior Circuit Judges.

MORGAN, Senior Circuit Judge.

Appellants Tom and Penny Crutchfield were convicted by a jury of charges involving the illegal importation and the intent to sell certain Figi banded iguanas in the United States, in violation of 18 U.S.C. §§ 545 and 371, and .16 U.S.C. §§ 3372(a)(1) and 3373(d)(1)(A) and (B). Both appellants subsequently filed timely motions for a new trial, asserting pervasive prosecutorial misconduct throughout the course of their first trial. The district court denied these motions. Appellants now appeal their respective convictions, contending that the prosecutor's numerous instances of misconduct during their two-week trial unfairly prejudiced the outcome of the proceeding. We have jurisdiction pursuant to 28 U.S.C. § 1291, and we REVERSE and REMAND for a new trial.

I. Factual Background

Appellants Tom and Penny Crutchfield are commercial importers and distributors of reptiles. Prior to their indictment in this action, the Crutchfields were the proprietors and managers of Herpetofauna, Inc., one of the largest dealers and importers of exotic reptiles in the United States. This case revolves around four rare lizards known as "Figi banded iguanas" which appellants, through Herpetofauna, Inc., owned from May of 1989 until August of 1990.

Figi Iguanas are internationally recognized as an endangered species. Convention on International Trade in Endangered Species of Wild Fauna and Flora, Mar. 3, 1973, 27 U.S.T. 1089, 1140 (CITES). Because of the Figis' endangered status, CITES regulates the importation of this special iguana into the United States. CITES requires that .an individual seeking to import a Figi first obtain a special authorizing permit from both the United States and the exporting country. *Id.* at 1095–96. Before the enactment of CITES, however, no permitting requirements for the importation of Figis were in place. Therefore, those Figi iguanas that found their way into the United States before the enactment of CITES (as well as their captive-bred progeny) may be possessed lawfully in the United States without a permit.

The crucial issue before the jury in the Crutchfield case was whether the Figis possessed by Herpetofauna between 1989 and 1990 were illegally imported into the United States by the Crutchfields without the requisite CITES permits, or whether these iguanas were the captive-bred progeny of legally imported "pre-act" Figis. Both sides offered contradictory testimony as to this question at trial. After hearing the evidence, the jury returned a verdict against the Crutchfields.

II. Discussion

■ Appellants urge this Court to reverse their respective convictions based on the prosecutor's pervasive misconduct during their trial. "Reversal on the basis of prosecutorial misconduct requires that the conduct be 'so pronounced and persistent that it permeates the entire atmosphere of the trial.'" *United States v. McLain,* 823 F.2d 1457, 1462 (11th Cir.1987) (quoting *United States v. Weinstein,* 762 F.2d 1522, 1542 (11th Cir. 1985), *cert. denied,* 475 U.S. 1110, 106 S.Ct. 1519, 89 L.Ed.2d 917 (1986)). Moreover, this Court recognizes that in evaluating a prosecutorial misconduct claim, reversal is warranted only if the misconduct prejudicially affects the substantial rights of the accused.

*See United States v. Eyster,* 948 F.2d 1196, 1206 (11th Cir.1991). The focus of our inquiry, therefore, is whether the appellants received a fair trial. After reviewing the record in this case, we find it is replete with examples of unquestionable prosecutorial misconduct that prejudiced both appellants to such a degree as to warrant a reversal of their convictions.

### A. *Prosecutor's Personal Interest in this Case*

The record in this case clearly indicates that the prosecutor, from the outset of the Crutchfields' trial, was more than professionally interested in its outcome. The prosecutor himself was a Herpetologist (an expert in the field of reptiles) and apparently had been a previous customer of the Crutchfields'. Because of the prosecutor's expertise, he was well versed in "reptile jargon" and familiar with the business aspect of both collecting and selling exotic reptiles. While this case concerned the fairly simple issue of whether the Crutchfields had illegally imported an endangered iguana species into the United States, many of the prosecutor's inquiries on direct and cross examination had little, if anything, to do with the resolution of this issue. Indeed, his examination of the witnesses included countless irrelevant inquiries seemingly designed only to display to the jury his own expertise in the reptile field.[1]

In response to the prosecutor's numerous lines of irrelevant questioning, appellants' counsel raised several relevancy objections. The court repeatedly sustained these objections and instructed the prosecutor to "move along"; however, the prosecutor ignored the court's instructions. Finally, as the quantity of irrelevant inquiries increased, the court was prompted to offer the following instruction *sua sponte:*

> "... Now, seriously, you have impressed all of us with your knowledge of this subject matter and it is quite interesting. However, some of it is a little far afield from the issues which are framed by the indictment ... but it will help us move along if you try to be a little more careful about the areas you go into."

Even this specific instruction by the court, however, proved ineffective. The prosecutor continued throughout the course of the trial to waste the valuable resources of the court by refusing to focus his inquiries on the issue before the jury.[2]

### B. *Improper Questioning of Witnesses*

Several lines of questioning pursued by the prosecutor in this case were not only completely irrelevant, but also constituted improper character evidence under Rules 404, 608 and 609 of the Federal Rules of Evidence. Although the record provides several examples of these improper and highly prejudicial prosecutorial inquiries, we will specifically address in detail only the two most egregious illustrations.[3]

### 1. *Direct Examination of Nora Dietlein.*

The first example arose during the prosecutor's direct examination of Nora Dietlein, a previous close friend and business partner of both Penny and Tom Crutchfield. After asking several preliminary questions regarding Dietlein's past relationship with the Crutchfields and their children, the prosecutor began his inquiry into the cause of the eventual disintegration of Dietlein's friendship and business association with the Crutchfields. The following colloquy occurred:

---

**1.** One illustrative example is the prosecutor's questioning on direct examination of several of his witnesses regarding their knowledge of and ability to identify particular reptile species. Despite their obvious irrelevancy, the prosecutor asked witnesses to identify photographs of almost fifty exotic reptiles, ranging from "False Gravial Crocodiles" to "Calico Reticulated Pythons". In addition to seeking the identification of these reptiles (only a handful of which even remotely fit into the lizard or iguana family), the prosecutor wasted hours of the court's time by probing many of his witnesses regarding their knowledge of these exotic reptiles' specific coloring, their breeding practices, and the prices they would command in the reptile market.

**2.** The above section (part II.A) is intended only to illustrate a few select instances of the prosecutor's obstinate behavior in this case. We do not mean to suggest by its inclusion, however, that repetitive irrelevant questioning *per se* constitutes reversible error.

**3.** Other examples include the prosecutor's consistent attempts to damage Tom Crutchfield's character by eliciting testimony from witnesses portraying him as a drunkard and as a violent man who mistreated his animals and whom his employees feared. Although the court sustained appellants' repeated objections to this testimony on the grounds that it violated Federal Rule of Evidence 404(a), the prosecutor continued these improper inquiries throughout the trial.

"Q. And did there come a time in your life when you had moved to British Columbia when you did something to hurt Tom and Penny that, perhaps, you wish you hadn't done now?

"A. Yes.

"Q. What did you do?

"A. After repeated phone calls from Tom harassing us in Canada, and my 85 year old mother had arrived to live with us and she got the last one and heard it, I phoned down at 8:30 p.m. our time, which meant there would be no one in their business premises, and I left a message on their answering machine that was hurtful to Penny.

"Q. What did you say in the message?

"A. I, I said, does Penny, do Penny's children know, as far as I remember now, that she was pregnant with another man's child when she married Tommy?"

Immediately after hearing this response from Dietlein, appellants' counsel objected. The court called both counsel to the bench and inquired as to the question's relevancy. The prosecutor then attempted to justify his inquiry by stating that he was "anticipating" that appellants' counsel would use the recorded message on cross examination in an effort to impeach Dietlein. He claimed to have introduced the substance of the message on direct to "draw the sting" from this anticipated attack. When the court asked appellants' counsel if he intended to use the recording on cross, however, counsel responded that he had never even heard of the incident, much less the existence of such a recording. The court properly struck Dietlein's testimony and instructed the jury to disregard the last answer given by Dietlein. Additionally, the court warned the prosecutor to be more careful in the future of what he brought up "in anticipation" of the defense.

## 2. *Cross Examination of Robert Harding*

A second example of the prosecutor's misconduct in his questioning of the witnesses came during his cross examination of defense witness Robert Harding. Harding was introduced by the defense as both a friend and former employee of Tom Crutchfield. During the course of his direct testimony, Harding stated that he had on occasion smoked marijuana with another of Crutchfield's former employees. The prosecutor began his cross-examination of Harding by asking:

"Q. You live down in that Ft. Myers Beach area for a long time?

"A. No sir.

"Q. Where did you live during most of that 20 years in Lee County?

"A. Most of the time I lived in either Ft. Myers or for the past approximately eight and a half years in Lehigh Acres.

"Q. Are you aware of the mullet boats coming in at night without lights around that area carrying the square grouper off of the boats there?"

At this point, appellants' counsel lodged an immediate objection. Before the court could rule on the objection, however, the prosecutor quickly asked:

"Q. Do you know what a square grouper is?"

Appellants' counsel again objected. The district court sustained this objection and began to instruct the prosecutor to wait until it had ruled on objections before continuing with his inquiry. The prosecutor, however, interrupted the court mid-sentence and posed the following question to Harding:

"Q. Weren't you involved in obtaining bales of pot?"

After hearing this final question, the court was forced to clear the courtroom. Appellants' counsel then moved for a mistrial based on the prosecutor's repeated improper inquiries designed solely to suggest the poor character of Harding in violation of Federal Rule of Evidence 608(b). The prosecutor responded by suggesting that his questions to Harding were somehow appropriate because of his personal expertise in the prosecution of drug cases and because of his knowledge of many illegal activities in the area where the witness resided. He also contended that defense counsel, during his direct examination of Harding, had opened the door to this line of questioning. The court disagreed and sustained appellants' objection. Upon their return, the court instructed the jury to disregard the last several questions asked by the prosecutor as they had been ruled improper.

■ We do not believe that a detailed explanation regarding the impropriety of ei-

ther of these lines of questioning is necessary. As to the testimony elicited from Nora Dietlein, we would hope that even the most inexperienced trial attorney would recognize that this testimony was clearly irrelevant, improper and prejudicial to the accused.[4] The prosecutor's decision to place the "sexual character" of Penny Crutchfield before the jury in a case involving the importation of iguanas is simply inexcusable. Such testimony could have been elicited only in an effort to damage Mrs. Crutchfield's character in the eyes of the jury.

 Similarly, the prosecutor's questioning of Robert Harding on cross examination was unquestionably out of line and an obvious violation of Federal Rule of Evidence 608(b).[5] We disagree with the prosecutor's contention at trial that Harding's single statement regarding his past occasional marijuana use entitled the prosecutor to follow up with questions about Harding's knowledge of "mullet boats" and "square grouper."[6] While questions regarding the extent of Harding's personal use of marijuana may have been proper on cross examination, questions designed to implicate Harding as a large scale buyer or distributor of marijuana clearly were not. These questions were outside the scope of direct examination. Moreover,

the prosecutor apparently lacked even a good faith basis for these allegations and was simply attempting to discredit Harding's testimony with the jury.[7]

C. *Disobedience of the District Court's Instructions and Rulings*

Throughout the two-week trial, the prosecutor displayed his apparent disrespect for the court by continuously disobeying the trial judge's instructions and rulings. To demonstrate, the record reflects numerous instances in which the prosecutor simply ignored the court's rulings on relevancy and improper character evidence objections. Instead of moving to another line of questioning after the court sustained these objections by appellants' counsel, the prosecutor continued on several occasions to make the same types of inquiries.[8]

Moreover, the prosecutor completely ignored the court's *in limine* evidentiary ruling excluding any testimony by the government regarding Tom Crutchfield's offer to sell the Figis to a particular group of Italians. During the prosecutor's opening argument, he mentioned that the jury would hear testimony from government witness Tom Stanley that Tom Crutchfield had offered to sell the Figis to Italian customers. After opening statements were completed, howev-

---

4. Such evidence is prohibited under Federal Rule of Evidence 404(b) which provides: "Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person. . . ."

5. Rule 608(b) generally prohibits the impeachment of witnesses by inquiry into specific bad acts of misconduct unless those acts resulted in a criminal conviction as described in Rule 609. *United States v. Cox*, 536 F.2d 65, 70 n. 11 (5th Cir.1976).

6. On appeal, the prosecutor apparently retracts from his original position and admits the impropriety of this line of questioning. He contends, however, that the appellants suffered no prejudice from his questioning of Harding because Harding never answered the improper questions, because the court issued a curative instruction to the jury after ruling that the questions were improper, and because Harding's testimony was simply "cumulative." We are not persuaded by these arguments.

7. When asked by the court whether he had any reason to believe that Harding was involved in

any way in the importation of marijuana, the prosecutor responded simply that he had "suggestions to that effect." However, he never offered to substantiate these "suggestions" for the court.

8. For example, after the court sustained the defense objection to the prosecutor's improper questioning of Robert Harding, the court instructed the prosecutor to move to another line of questioning. The jury then returned, and the prosecutor immediately pursued his original line of questioning by asking:

"Q. How much pot would you smoke on a daily basis in those 20 years?
"A. I didn't smoke it on a daily basis.
"Q. Were you getting it locally?
"A. Sometimes.
"Q. Who were you getting it from?
"Appellants' Counsel: Your Honor, I object.
"The Court: Sustained.
"Q. In what quantities were you getting your pot?
"Appellants' Counsel: Objection, Your Honor.
"The Court: Sustained."

er, the court excluded any testimony by Stanley regarding this alleged sale to the Italians. Ignoring this ruling, the prosecutor asked during his direct examination of Stanley:

"Q. Do you know whether Mr. Crutchfield ever attempted to sell these animals to anybody?

"A. Yes.

"Q. Did he?

"A. As far as I know, what I would assume would be a sales, yeah.

"Q. Was there any particular customers that come to mind?

"Appellants' Counsel: Objection, Your Honor.

"The Court: You're not going to ask him what we have already discussed at sidebar, are you?

"The Prosecutor: Well, I'd like to revisit that issue at some time.

"The Court: Well, I've ruled on that issue so, if you have other information, then go ahead and ask the question."

The prosecutor apparently had no other information to offer the court other than that which the court had already ruled was improper. By posing these questions to Stanley, however, the prosecutor was able to leave with the jury at least the suggestion that Crutchfield had attempted to sell the Figis when no admissible evidence as to this sale existed.

### III. CONCLUSION

■ We conclude that the record supports appellants' contention that the prosecutor was guilty of multiple and continuing instances of intentional misconduct that prejudicially affected the substantial rights of both appellants. While we recognize that a United States Attorney should "prosecute with earnestness and vigor," we also acknowledge "his duty to refrain from improper methods calculated to produce a wrongful conviction." *United States v. Eason*, 920 F.2d 731, 736 n. 8 (11th Cir.1990) (quoting *Berger v. United States*, 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314, 1321 (1935)).

■ On numerous occasions during this trial, the prosecutor flagrantly violated Rules 404, 608 and 609 of the Federal Rules of Evidence by repeatedly and improperly attacking the character of the defendants and their witnesses. These attacks often continued even after the court instructed the prosecutor as to their impropriety. The prejudicial effect of this misconduct cannot be disputed, as this case turned largely on the jury's credibility determinations of the several witnesses who testified. Furthermore, we are unpersuaded by the government's argument that any misconduct which may have occurred during the trial was neutralized by the court's several curative instructions and, therefore, did not affect the outcome of the proceeding. As we noted in *United States v. McLain*, 823 F.2d 1457, 1462 n. 8 (11th Cir. 1987), "a jury cannot always be trusted to follow instructions to disregard improper statements." When improper inquiries and innuendos permeate a trial to such a degree as occurred in this case, we do not believe that instructions from the bench are sufficient to offset the certain prejudicial effect suffered by the accused. Accordingly, we REVERSE and REMAND this case for a new trial.

REVERSED and REMANDED.