[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 15-13385

_____

D.C. Docket No. 2:14-cr-00020-JES-CM-5

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

BOBBY LESANE, JR.,
MAURY CARSON MORRIS,

Defendants - Appellants.

_____

No. 15-14440

_____

D.C. Docket No.  2:14-cr-00020-JES-CM-1

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

LORENZO D. HOOD,

Defendant - Appellant.

_____

Appeals from the United States District Court
for the Middle District of Florida
_____

(April 12, 2017)

Before TJOFLAT, HULL, and O'MALLEY,[*] Circuit Judges.

O'MALLEY, Circuit Judge:

In this consolidated appeal, defendants Bobby Lesane Jr., Maury Carson Morris, and Lorenzo D. Hood challenge their convictions. Defendant Lesane also challenges his sentence. After review of the record and the parties' briefs, and with the benefit of oral argument, we affirm in part, vacate in part, and remand.

## I.  BACKGROUND

We address the background in four parts:  the evidence supporting the defendants' convictions, the proceedings in the district court, the defendants' convictions and sentences, and the circumstances surrounding this appeal.

---

[*]Honorable Kathleen M. O'Malley, United States Circuit Judge for the Federal Circuit, sitting by designation.

**A.    Facts Underlying the Defendants' Convictions**

This case arises from a drug trafficking operation in Lee County, Florida. Below, we set forth the evidence pertaining to the operation and investigation of this drug activity.

**1.    Nixon's Controlled Purchases**

In January 2013, an individual named Jason Nixon went to a house on Utana Avenue in Fort Myers, Florida to buy drugs from defendant Hood. During this meeting, Nixon noticed pots and pans for cooking drugs inside the house and a surveillance camera monitoring the front door. Nixon bought an ounce of cocaine from Hood during this January 2013 transaction.

In February 2013, the Fort Myers Police Department ("FMPD") began investigating Nixon for drug activity. On three separate occasions during that month, a confidential informant met with Nixon and bought marijuana and methylenedioxy-methamphetamine, also known as MDMA or ecstasy. In May 2013, FMPD officers confronted Nixon about these drug sales. To avoid prosecution, Nixon agreed to cooperate with the FMPD and to participate in controlled drug purchases.

With Nixon's cooperation, the FMPD continued their ongoing investigation of a residence located at 6226 Demery Circle in Fort Myers ("6226 Demery"). Police had been investigating this home for drug activity since April 2013. Based

3

on their investigations, FMPD officers knew that the residence at 6226 Demery was equipped with surveillance devices so that the occupants could see any activity taking place outside the house.  Officers also knew, based on their surveillance of 6226 Demery, that defendant Hood was frequently at the residence, along with his brother James Hood and his girlfriend Edricka Cook.[1]

Sometime in April or May 2013, Nixon conducted his first controlled drug transaction at 6226 Demery.  FMPD officers monitored, but did not record, this first transaction.  During this first controlled buy, Nixon went to 6226 Demery, where he met James Hood at the back door and asked for a "poolie"—around 3.5 grams—of cocaine.  After Nixon gave James Hood the money, defendant Morris came to the door and gave Nixon the cocaine.  This amount of cocaine had a value of $160.  After leaving 6226 Demery, Nixon handed the drugs over to FMPD officers.

From May to September 2013, with Nixon's help, the FMPD carried out and recorded eight controlled drug purchases at 6226 Demery.  During each transaction, Nixon carried concealed video and audio recording devices.  On May 31, 2013, Nixon bought drugs from James Hood at 6226 Demery; defendant Lesane also was present.  On June 26, 2013, Nixon again bought drugs from James

---

[1]James Hood is not involved in this appeal but was charged along with defendants Lesane, Morris, and Hood.  James Hood pled guilty before trial.  FMPD officers interviewed James Hood during their investigation of 6226 Demery, but James Hood refused to cooperate as a confidential informant.

Hood at 6226 Demery.  Nixon testified that defendant Hood was in the kitchen during this transaction.  On June 28, 2013, Nixon bought cocaine from James Hood at 6226 Demery.  An individual named Walter Campbell was present at the residence during that transaction.[2]  On July 3, 2013, Nixon went to 6226 Demery and bought cocaine from James Hood and Walter Campbell.

On August 2, 2013, Nixon conducted another controlled buy at 6226 Demery, during which he purchased cocaine from defendant Lesane.  During this transaction, Nixon gave defendant Lesane money and told defendant Lesane how much cocaine he wanted to buy.  Defendant Lesane then walked into the house, through the living room, and into a room off to the right.  Defendant Lesane then came back and handed Nixon the drugs.

On August 8, 2013, Nixon bought cocaine from defendant Hood at 6226 Demery.  James Hood and Walter Campbell were also present.  During this August 8 transaction, Nixon asked defendant Hood for a poolie of cocaine.  Defendant Hood then walked into the house, through the kitchen, and into a room off to the right.  Defendant Hood returned with a large bag of cocaine, from which he measured out a poolie for Nixon.  Nixon paid defendant Hood $160 for this amount of cocaine.

---

[2]Walter Campbell is not involved in this appeal but was charged along with defendants Lesane, Morris, and Lorenzo Hood.  Walter Campbell pled guilty before trial.

On September 7, 2013, Nixon again bought drugs at 6226 Demery. For each of these controlled purchases, FMPD officers searched Nixon beforehand to ensure that he was not in possession of any other contraband. FMPD officers also provided Nixon with money for each controlled purchase. The amount varied, but the average transaction was for $160. After each recorded purchase, Nixon handed the drugs over to FMPD officers.

2.    September 9, 2013 Search at 6226 Demery

On September 9, 2013, FMPD officers executed a search warrant at 6226 Demery. As officers approached the house, three people fled from the back door. Cook was the only person in the house when officers entered. Officers found Cook in a bedroom, where she was on her knees with her hands underneath the bed. When officers looked under the bed, they discovered a bag containing cocaine and heroin. In various places throughout the house, officers found more cocaine, cash, digital scales, and drug paraphernalia.

In addition, officers recovered from the house several items of mail addressed to defendant Hood and Cook at the address 1606 Hibiscus Avenue in Lehigh Acres ("1606 Hibiscus"), including a "notice to pay rent or quit" addressed to Cook at 1606 Hibiscus. FMPD officers also recovered footage from the surveillance equipment used to monitor activity outside the residence. The footage, which spanned a period reaching back to about two weeks before the

FMPD searched the residence, showed numerous people coming and going from 6226 Demery on a regular basis. The footage also showed what police believed to be twenty or thirty drug transactions taking place at 6226 Demery over a two-week period.

Based on the footage, FMPD officers believed that one group of people consistently worked inside the residence, while other individuals regularly came to the residence to purchase drugs. Defendants Lesane, Hood, and Morris, as well as Walter Campbell, all appear in the footage from 6226 Demery, apparently conducting drugs transactions.

The portion of the footage covering September 9, 2013, shows that defendants Lesane and Hood, as well as Walter Campbell, were all present at 6226 Demery on that day, but that they left a few hours before FMPD officers executed the search warrant. The September 9 footage also showed defendant Morris and James Hood fleeing the residence as officers arrived to execute the search warrant.

3.    Herman's Controlled Purchases

After executing the search warrant on September 9, 2013, the FMPD continued their surveillance of 6226 Demery. During this period following the September 9 search, officers observed an individual named Nicholas Herman at 6226 Demery on several occasions. Herman testified that he had been buying personal use amounts of cocaine and heroin from defendant Hood and his

associates for eight or nine years.  Herman testified that he bought drugs from defendant Morris and James Hood at least twenty times each.  Herman also saw defendant Hood selling drugs to others.

Sometime between September 9 and October 1, 2013, FMPD officers stopped Herman while he was driving away from a visit to 6226 Demery.  Officers discovered that Herman was carrying drugs and eventually charged him with possession of cocaine and heroin.  To avoid prosecution, Herman agreed to cooperate as a confidential informant.

During October 2013, Herman made a series of controlled, recorded drug purchases from 6226 Demery.  On October 1, Herman went to 6226 Demery and bought cocaine and heroin from James Hood.  On October 15, Herman went to 6226 Demery, gave money to defendant Hood, and received cocaine and heroin from someone else inside the house.  On October 16, Herman went to 6226 Demery and bought cocaine and heroin from James Hood.  On October 17, Herman went to 6226 Demery and bought cocaine and heroin from someone who may have been James Hood.  On October 18, Herman went to 6226 Demery, again purchasing cocaine and heroin.

On October 23, Herman went to 6226 Demery, where he bought cocaine and heroin.  The video from this transaction showed that defendant Morris entered the residence at 6226 Demery after Herman initially arrived.  Herman testified that, on

8

that day, defendant Morris came from a different house, located next door to 6226 Demery.  Upon arriving at 6226 Demery from the house next door, Morris weighed out the drugs for Herman.

After Herman completed this series of controlled buys, FMPD officers asked Herman to identify the individuals from whom he bought drugs at 6226 Demery. FMPD officers prepared photo lineups and asked Herman to identify the individuals with whom he dealt during the October 23 transaction.  Using these lineups, Herman identified defendant Morris.

4.    October 24, 2013 Search of 6226 Demery and 6220 Demery

On October 24, 2013, FMPD officers executed a second search warrant at 6226 Demery.  When officers arrived at 6226 Demery, no one was inside the house; the defendants here—Hood, Lesane, and Morris— were all next door. During the search of 6226 Demery, FMPD officers found cocaine hidden in various places throughout the house.  Officers also found two digital scales in the kitchen.

At the same time, officers executed a search warrant for the residence next door—6220 Demery Circle ("6220 Demery").  Cook owned the property at 6220 Demery.  An individual named Terry Little, who lived at 6226 Demery during the fall of 2013, testified that defendant Hood lived next door at 6220 Demery.

Little also testified that, during the time he lived at 6226 Demery, he saw defendant Morris at 6226 Demery on a daily basis. In addition, Little testified that he bought cocaine from "pretty much everybody" at 6226 Demery, including defendants Hood and Morris, and James Hood. Little stated that everyone at 6226 Demery seemed to be working for defendant Hood.

5.      October 29, 2013 Arrest of Defendant Hood

On October 29, 2013, FMPD officers, with the help of several United States Marshals, went to locate defendant Hood and execute a warrant for his arrest. Officers thought that they might find defendant Hood at 1606 Hibiscus, because his driver's license listed this residence and because a motorcycle that defendant Hood regularly used was parked near the front door of that house.

Before entering the house, officers surveilled the property for a period of two or three hours. During that period, officers observed someone peeking through the blinds of a window next to the front door on the north side of the house. It appeared that the person was using a black object to push through the blinds and look outside.

Around two o'clock in the afternoon, a group of approximately six FMPD officers and marshals approached the house at 1606 Hibiscus, knocked on the front door, and announced their presence. After receiving no response for several minutes, officers breached the door. Once inside, the officers yelled for defendant

Hood to come out.  After a few seconds, he emerged from a room in the rear on the south side of the house and began to walk into the foyer toward the officers. Officers then took defendant Hood into custody in the foyer.  After taking him into custody, officers took defendant Hood outside the home.  One officer testified that defendant Hood's attitude and conduct appeared to be "evasive."

While inside the home, officers conducted what they alleged to be a protective sweep search.  Because defendant Hood emerged from a room in the rear on the south side of the house, the officers believed that someone else might have been in the front on the north side of the house—where they had seen someone peeking through the blinds.

Officers first checked for other people in the kitchen area of the house. There, the officers found scales, drug paraphernalia, and what looked like crack cocaine residue on the counter.

While checking the room with the window in which they had seen movement, officers found a rifle and an unattached rifle scope.  According to two officers, this rifle scope was consistent with the object they previously saw poking through the blinds.  Officers also noticed a closet inside this room, the door to which was ajar.  Through the open closet door, officers could see a number of rifles and shotguns inside the closet.

Meanwhile, other officers looked through the south side of the house, from which defendant Hood had emerged.  Officers found a variety of ammunition, some of which was compatible with firearms found in the house.  In addition, officers found another rifle equipped with attachments like a tripod, scope, and light.

In the master bedroom, officers found a box containing cocaine and a device commonly used to press loose cocaine into a block.  On the dresser in the master bedroom, officers discovered mail addressed to defendant Hood at 1606 Hibiscus.  According to an officer who participated, the sweep of 1606 Hibiscus lasted no longer than three or four minutes in total.

Detective Christopher Tice testified that, on October 29, 2013, he received word from the Lee County Warrants Unit that officers were at 1606 Hibiscus executing an arrest warrant for defendant Hood.  The officers told Tice that they saw narcotics-related items in plain view while sweeping the home.  That same day, Detective Tice obtained a search warrant for 1606 Hibiscus, which he executed that same day.  During his search of the residence, Tice took photographs of the drugs, drug paraphernalia, firearms, and ammunition in the house.

At trial, defendant Hood and the government entered a stipulation which stated that the parties "agree that, on October 29, 2013, the Defendant Lorenzo D.

Hood was a convicted felon whose rights to [possess] firearms and ammunition had not been restored by the State of Florida."

6.      March 14, 2014 Interview with Defendant Hood

On March 14, 2014, an agent from the Drug Enforcement Administration interviewed defendant Hood.  After being advised of his right to remain silent, defendant Hood stated that he sold drugs for financial gain and that he had sources of supply in Lee County and on Florida's east coast.  Defendant Hood further stated that he used 6226 Demery as a drug distribution location.  In particular, defendant Hood admitted that he sold both cocaine and heroin.

7.      Other Arrests and Statements in Jail

On June 26, 2014, defendant Morris was arrested.  Defendant Lesane, who was already in state custody, was transferred to federal custody after his indictment in this case.  While they were incarcerated in the Charlotte County jail, defendants Hood and Morris discussed this case with inmate Gary Williams.  Defendant Hood told Williams that he was selling cocaine at such a high rate that it did not matter that the cocaine was so expensive to obtain.  He told Williams that the guns at his house were his, that he was unsure whether one of the guns at his house was fully automatic, and that he was concerned about receiving a sentence enhancement for having automatic weapons.  Defendant Hood further told Williams that Cook was going to claim that the guns were hers because the house was in her name.

Defendant Morris told Williams that he sold small bags of heroin and cocaine out of one of the houses.

## B.    District Court Proceedings

On May 14, 2014, the government filed a superseding indictment charging defendants Hood, Lesane, and Morris, as well as James Hood and Walter Campbell, with various drug and gun offenses.  James Hood and Walter Campbell pled guilty to all charges against them.

### 1.    Charges Against Defendants Lesane, Morris, and Hood

The superseding indictment charged defendant Lesane with: conspiracy to distribute and possess cocaine, cocaine base, and heroin with intent to distribute, between 2004 and 2013, in violation of 21 U.S.C. § 846 (Count 1); and possession of cocaine with intent to distribute and distribution of cocaine, on August 2, 2013, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2 (Count 4).

The superseding indictment charged defendant Morris with: conspiracy to distribute and possess cocaine, cocaine base, and heroin with intent to distribute, between 2004 and 2013, in violation of 21 U.S.C. § 846 (Count 1); and possession of heroin with intent to distribute and distribution of heroin, on October 23, 2013, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2 (Count 7).

The superseding indictment charged defendant Hood with: conspiracy to distribute and possess cocaine, cocaine base, and heroin with intent to distribute,

between 2004 and 2013, in violation of 21 U.S.C. § 846 (Count 1); possession of cocaine with intent to distribute and distribution of cocaine, on August 8, 2013, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2 (Count 5); possession of cocaine and heroin with intent to distribute, on September 9, 2013, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2 (Count 6); possession of cocaine with intent to distribute, on October 29, 2013, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2 (Count 8); and possession of firearms and ammunition as a previously convicted felon, on October 29, 2013, in violation of 18 U.S.C. § 922(g) (Count 9).

2.    Defendant Hood's Pretrial Motion to Suppress

On August 25, 2014, defendant Hood filed a motion to suppress evidence obtained as a result of the October 29, 2013 sweep of the house at 1606 Hibiscus. In his motion, Hood argued that, after he was arrested and taken outside the home, officers re-entered the home without legal justification.

On October 7, 2014, the magistrate judge held a hearing on the motion and, on October 20, 2014, the magistrate judge entered a report recommending that the motion to suppress be denied. In that report, the magistrate judge found that the officers who searched defendant Hood's home had a reasonable belief that someone else was inside the house, and thus that they were entitled to engage in a protective sweep for their own safety. The magistrate judge further found that the

15

search was appropriate in scope and duration and that the evidence discovered in plain view could be properly used to obtain a search warrant, which officers then did at 1606 Hibiscus. Alternatively, the magistrate judge found that, even if the sweep was invalid, the officers had sufficient probable cause to seek a search warrant based on their discovery of drug paraphernalia in plain view so that the discovery of the confiscated evidence would have occurred in any event.

On December 10, 2014, over defendant Hood's objections, the district court adopted the magistrate judge's report without alteration or addition, and denied the motion to suppress.

3.    Trial

On March 10, 2015, defendants Lesane, Morris, and Hood jointly proceeded to jury trial. None of the defendants moved to sever their trial from that of the others. During opening statements, counsel for the government made the following comment about the nature of the case:

> As Judge Steele told you earlier today, this case is about drugs and it's about guns. The defendants Lorenzo Hood, Bobby Lesane, and Maury Morris are each charged with conspiracy to possess and distribute cocaine, cocaine base or crack cocaine, and heroin. That conspiracy began back around 2004 and continued into 2013.

Morris's counsel did not object to this statement.

At the close of the government's case, defendant Hood moved for a judgment of acquittal as to Counts 1, 6, and 9. Defendants Morris and Lesane each

moved for a judgment of acquittal as to Count 1.  The district court denied all of these motions.

After the denial of the Rule 29 motions, defendants Hood, Morris, and Lesane announced their intention not to testify.  Defendants Hood and Lesane rested without presentation of evidence.  Defendant Morris presented the testimony of Angelique Brown, his fiancée.  Brown testified, among other things, that she never saw defendant Morris with James Hood, defendant Hood, defendant Lesane, or Walter Campbell.

During closing statements, counsel for the government made the following statement about footage showing defendant Morris at 6226 Demery:

> Now, somewhat similarly to Bobby Lesane, on [the government's video exhibit], for one, you see Maury Morris chasing after somebody.  Mr. Morris comes out the door, goes back in, comes out again, with something that, quite frankly, appears to be a handgun in his left hand, and he chases after somebody.

Again, Morris's counsel did not object to this statement.  Instead, he discounted this evidence during his closing statement, noting that the government had not taken the time to blow up or enhance the image to show whether he was, in fact, carrying a firearm.

## C.    Convictions and Sentences

### 1.    Lesane

On March 20, 2015, the jury found defendant Lesane guilty of Counts 1 and 4. On July 20, 2015, the district court held a sentencing hearing as to defendant Lesane. The presentence investigation report ("PSR") indicated that defendant Lesane qualified as a career offender under the sentencing guidelines. See generally U.S.S.G. § 4B1.1. The PSR stated that defendant Lesane's offenses of conviction constituted controlled substance offenses, and that he also had two prior felony convictions for either a crime of violence or a controlled substance offense. First, in 2005, defendant Lesane was convicted of possession with intent to sell a controlled substance within 1,000 feet of a school and possession of marijuana with intent to sell (both on the same occasion). Second, on October 24, 2014, defendant Lesane pled nolo contendere to burglary of an unoccupied dwelling. With the career offender enhancement, the PSR calculated defendant Lesane's total offense level as 32 and his criminal history category as VI. This yielded a guidelines range of 210 to 262 months' imprisonment.

At the sentencing hearing, defendant Lesane did not formally object to any aspect of the PSR. The district court adopted the factual statements in the PSR and, in turn, the PSR's application of the guidelines. Before the district court pronounced sentence, counsel for defendant Lesane offered argument regarding the

18

2014 conviction for burglary of an unoccupied dwelling.  Defendant Lesane's

attorney made the following statements during the hearing:

> Mr. Lesane is a career offender because of the two offenses.  The second offense is burglary of an unoccupied dwelling, unarmed.  That case was from 2014, or after the offenses for his conviction in federal court.  Or after the timing of the convictions in federal court.  Or when he committed those offenses.
>
> Right now he's pled guilty, but is waiting on sentence . . . .  [H]e pled guilty pursuant to a plea agreement.  He has not been adjudicated guilty, however, he's pled in open court with a plea agreement that's been accepted by the judge.
>
> Under 4b1.1 that is a determination of guilt, Your Honor.  But for that one offense, which occurred after the transaction for which he went to trial here, Your Honor, that takes him up eight levels, as a career offender . . . .
>
> We would argue, Your Honor, that under 4A1.3, that that is—would over-represent his criminal history, a likelihood that Mr. Lesane would commit other crimes and respectfully request a downward departure.

When asked by the district court whether he was "contesting the accuracy of

[defendant Lesane's] classification of being a career offender," the attorney

responded:

> I cannot do that because the language says that the guilt—the guilt of the Defendant has been established whether by guilty plea, trial, or plea of nolo contendere.  Which he's made the guilty plea, but he did not get adjudicated.  It doesn't say you have to be adjudicated in a state court.  But our main argument, the offense that determines him to be a career offender is after the drug transaction conspiracies for which he was convicted, Your Honor.

19

The district court noted that it was "required to impose a sentence that is sufficient, but not greater than necessary, after considering all the factors in Title 18, United States Code, Section 3553, and that it "considered those factors, whether we discuss them individually or not." The district court then sentenced defendant Lesane to 210 months' imprisonment on both convictions, to run concurrently.

2.    Morris

The jury found defendant Morris guilty of Count 1, but only with respect to cocaine and heroin, not as to cocaine base in particular. The jury also found defendant Morris guilty of Count 7.

The district court sentenced him to 180 months' imprisonment on both convictions, to run concurrently. He does not challenge his sentence on appeal.

3.    Hood

The jury found defendant Hood guilty of Counts 1, 5, 6, 8, and 9. The district court sentenced defendant Hood to 235 months' imprisonment on Counts 1, 5, 6, and 8, and to 120 months' imprisonment on Count 9, all to run concurrently. He does not challenge his sentence on appeal.

**D.    Appeal**

On July 28, 2015, defendants Morris and Lesane timely filed their notices of appeal. On October 5, 2015, defendant Hood filed a notice of appeal in a separate

case.  On October 20, 2015, the government filed an unopposed motion to consolidate these appeals, which this Court granted.  Below, we address the issues on appeal as they relate to each defendant.

## II.  LESANE

### A.    Sufficiency of the Evidence to Support Heroin Conviction

First, Lesane contends that the evidence was insufficient to support his conspiracy conviction as it relates to heroin.  We review de novo the sufficiency of the evidence to support a guilty verdict.  United States v. Isnadin, 742 F.3d 1278, 1303 (11th Cir. 2014).  In doing so, we view the evidence in the light most favorable to the government and resolve all reasonable inferences and credibility choices in favor of the verdict.  Id.  If a reasonable trier of fact could find that the evidence established guilt beyond a reasonable doubt, the evidence is sufficient to support the conviction.  Id.

To convict a defendant for conspiracy, the government must establish that (1) an illegal agreement existed, (2) the defendant knew about the agreement, and (3) the defendant knowingly and voluntarily joined it.  United States v. McDowell, 250 F.3d 1354, 1365 (11th Cir. 2001).  The government need not prove the defendant's participation in the conspiracy by direct evidence.  Id.  A common purpose or plan may be inferred based on "a development and collocation of circumstances."  Id. (quoting United States v. Khoury, 901 F.2d 948, 962 (11th

21

Cir. 1990)).  Mere presence at the scene of a crime is insufficient to sustain a conspiracy conviction.  Id.  Presence is probative, however, of the defendant's knowing and voluntary participation in the illicit endeavor.  Id.

Here, Lesane claims that his conviction cannot stand as it related to heroin because the government did not show that he sold any of the heroin used as evidence in the case.  According to Lesane, the only evidence linking him to the heroin conspiracy consisted of: (1) heroin transactions for which he was not the direct seller; and (2) amounts of heroin recovered during a search of 6226 Demery.  Though Lesane acknowledges that the government's evidence showed him making drug transactions, he maintains that the government failed to prove that any of these transactions involved heroin.

We conclude that the evidence was sufficient to support Lesane's conspiracy conviction, including as it related to possession and distribution of heroin.  Lesane does not dispute on appeal his extensive participation in the conspiracy with respect to cocaine.  That participation necessarily placed him in regular contact not only with the other defendants, but also the customers and residences central to the conspiracy.  In particular, though the evidence did not include a specific instance in which Lesane sold heroin, there was ample evidence showing that his associates sold heroin at 6226 Demery on a number of occasions—and that Lesane was frequently present at the residence while this drug

22

activity was ongoing.  Nixon, for example, testified that Lesane was present during controlled drug transactions at 6226 Demery and even delivered drugs to customers.  Likewise, footage of controlled transactions showed Lesane at the house while the drug operation was ongoing.

Under these circumstances, we find that a reasonable jury could have concluded beyond a reasonable doubt that there was an agreement to possess and sell cocaine and other drugs, including heroin, that Lesane knew of this agreement, and that he voluntarily participated in it.  Accordingly, we affirm Lesane's conspiracy conviction to the extent that he challenges his criminal liability for possession with intent to sell heroin.

## B.    Application of the Career Offender Sentencing Guideline

Second, Lesane contends that the district court erred in classifying him as a career offender, because his 2014 burglary conviction does not qualify as a predicate offense under the sentencing guidelines.  The district court's decision to classify a defendant as a career offender is a question of law that we ordinarily review de novo.  United States v. Gibson, 434 F.3d 1234, 1243 (11th Cir. 2006).  Where the defendant did not raise his objection in the district court, however, we review the issue only for plain error.  United States v. Rodriguez, 751 F.3d 1244, 1257 (11th Cir. 2014).  Where a defendant actually invites error, we are wholly

23

precluded from reviewing the error on appeal. United States v. Harris, 443 F.3d 822, 823-34 (11th Cir. 2006).

Before we address whether the district court incorrectly applied the career offender enhancement, we must determine whether this issue is amenable to review, and, if so, under what standard. While the government suggested in its brief that, by acknowledging that the guideline calculations in the PSR were appropriate, Lesane invited this error, the government retreated from that position at oral argument and stated that they were not asking us to bar review of Lesane's sentencing appeal. We accept that concession.

Indeed, we do not believe that Lesane conceded that the career offender enhancement applied. Lesane's counsel argued that the application of the career offender enhancement was too harsh because the 2014 burglary conviction occurred after Lesane was arrested for the drug conspiracy in 2013. Specifically, Lesane urged the district court to depart from the enhanced guidelines range, arguing that the application of the career offender enhancement would distort the reality of Lesane's criminal history at the time of the offense of conviction. Although Lesane's counsel phrased his position as one seeking a departure, the point regarding the timing of the second conviction clearly was made. Though inartfully, we believe Lesane's counsel preserved his objection to application of the career offender enhancement.

24

Under these circumstances, we may consider the merits of that objection. Because Lesane did not actually object to the guideline calculations in the PSR, however, we review this issue for plain error. See Rodriguez, 751 F.3d at 1257. Under that standard of review, we may only reverse where there is plain error that affects substantial rights. United States v. Williams, 469 F.3d 963, 966 (11th Cir. 2006).

Under § 4B1.1 of the sentencing guidelines, a defendant qualifies as a career offender only where he has "at least two prior felony convictions of either a crime of violence or a controlled substance offense." U.S.S.G. § 4B1.1(a). The sentencing guidelines further provide that "[t]he term 'two prior felony convictions' means . . . the defendant committed the instant offense of conviction subsequent to sustaining at least two felony convictions of either a crime of violence or a controlled substance offense . . . ." Id. § 4B1.2(c) (emphasis added).

Here, Lesane's 2014 conviction for burglary of an unarmed dwelling could not serve as a predicate crime of violence under the career offender provisions. Federal authorities arrested Lesane in connection with the instant federal offense in October 2013. Lesane pleaded nolo contendere to the burglary offense in October 2014. Though a plea of nolo contendere is sufficient to constitute a felony "conviction" within the meaning of the sentencing guidelines, see United States v. Elliot, 732 F.3d 1307, 1313 (11th Cir. 2013), a conviction only qualifies as a

"prior" felony conviction where it occurs before the defendant commits the instant offense of conviction. U.S.S.G. § 4B1.2(c). Under the language of the sentencing guidelines, this 2014 burglary offense does not qualify as a prior felony conviction vis-à-vis Lesane's 2013 drug crime. See United States v. Williams, 29 F.3d 172, 174 (4th Cir. 1994) ("[C]onvictions sustained subsequent to the conduct forming the basis for the offense at issue cannot be used to enhance a defendant's status to career offender."). The government concedes this point.

Given the effect this error had on Lesane's guidelines range, we also conclude that this error affects his substantial rights. The PSR reflects—and the government concedes—that, without the career offender enhancement, Lesane's offense level only would have been twenty-four; combined with his criminal history category of VI, that would have yielded a guidelines range of 100 to 125 months' imprisonment as opposed to 210 to 262 months. See U.S.S.G. ch. 5, pt. A. Where, as here, the district court sentenced the defendant under an incorrect guidelines range, the defendant obviously can show a reasonable probability that the district court would have imposed a different sentence under the correct guidelines range. Molina-Martinez v. United States, 136 S. Ct. 1338, 1349 (2016). And where that reasonable probability exists, the defendant succeeds in showing that the error affected his substantial rights and, thus, was plain. Id.

We conclude that the district court plainly erred in sentencing Lesane as a career offender based on his 2014 conviction for burglary of an unoccupied dwelling.  We accordingly vacate Lesane's sentence and remand for resentencing.

## C.    Substantive Reasonableness of Sentence

Third, Lesane contends that his sentence is unreasonable under United States v. Booker, 543 U.S. 220, 125 S. Ct. 738 (2005).  Under Booker and its progeny, when we review the reasonableness of a sentence, we review for abuse of discretion.  Gall v. United States, 552 U.S. 38, 51 (2007).  We must first ask whether the district court committed a significant procedural error, such as improperly calculating the guidelines range or failing to consider the factors set forth in 18 U.S.C. § 3553(a).  Id.  If the sentence is procedurally sound, we then must consider the substantive reasonableness of the sentence under the totality of the circumstances.  Id.

Because we remand for resentencing in light of the erroneous application of the career offender enhancement, we need not decide the reasonableness of Lesane's sentence under Booker.  After recalculating Lesane's guidelines range under the appropriate principles, the district court should impose a sentence it deems appropriate in light of the factors set forth in § 3553(a).

27

### III.  MORRIS

A.    **Sufficiency of the Evidence to Support Conspiracy Conviction**

First, Morris argues that the evidence is insufficient to support his drug conspiracy conviction under Count 1.  Morris does not raise a sufficiency of the evidence challenge to his conviction for possession with intent to distribute heroin under Count 7.

As noted above, we review de novo the sufficiency of the evidence to support a guilty verdict, viewing the evidence in the light most favorable to the government and resolving all reasonable inferences and credibility choices in favor of the verdict.  Isnadin, 742 F.3d at 1303 (11th Cir. 2014).

Here, Morris contends, in cursory fashion, that "the government offered no evidence directly showing . . . Morris's participation in drug-related activities." According to Morris, his continued presence at 6226 Demery is explained by his employment with a landscaping company that operated out of that residence.  In sum, Morris argues that the evidence is insufficient to establish that he was actually involved in the conspiracy.

We disagree.  The evidence adduced at trial showed that Morris was present at 6226 Demery on a regular basis while drug activity was ongoing.  The evidence indicated that Morris participated directly in the enterprise by selling drugs to confidential informants.  Herman testified, for example, that he bought drugs from

28

Morris upwards of twenty times.  And recordings of controlled purchases with confidential informants showed Morris's involvement in the sale of drugs at 6226 Demery in particular.  Corroborating this evidence, Morris himself told a cellmate in the Charlotte County jail that he was responsible for selling small amounts of cocaine and heroin out of 6226 Demery.

To the extent Morris argues that his conspiracy conviction cannot stand because the evidence does not show that he was involved in the conspiracy for its entire duration, we reject that contention as well.  The government need not prove that each conspirator participated in every aspect of the enterprise or for the entirety of its operation.  United States v. Vernon, 723 F.3d 1234, 1273 (11th Cir. 2013); United States v. Hansen, 262 F.3d 1217, 1247 (11th Cir. 2001).  It is clear that Morris participated in some affirmative conduct in furtherance of the drug enterprise at 6226 Demery, and that is all the law requires.

After a thorough review of the record, we conclude that the evidence is sufficient to show that Morris knew of the overall drug conspiracy and voluntarily participated in it.  See McDowell, 250 F.3d at 1365.  We therefore affirm Morris's drug conspiracy conviction.

## B.     Prosecutorial Misconduct

For the first time on appeal, Morris contends that the prosecutor engaged in misconduct by making certain statements about the role that guns played in the

drug conspiracy at 6226 Demery.  Morris submits that, in light of this alleged misconduct, he is entitled to a reversal of both his drug conspiracy conviction (Count 1) and his substantive drug conviction (Count 7).

Ordinarily, we review a defendant's claim of prosecutorial misconduct de novo.  United States v. Merrill, 513 F.3d 1293, 1306 (11th Cir. 2008).  Where the defendant fails to object to a prosecutor's statements at trial, however, we review only for plain error "that is so obvious that failure to correct it would jeopardize the fairness and integrity of the trial."  Id. at 1306-07 (quoting United States v. Bailey, 123 F.3d 1381, 1400 (11th Cir. 1997)).  Under plain error review, we reverse based on alleged prosecutorial misconduct only where the alleged misconduct is "so pronounced and persistent that it permeates the entire atmosphere of the trial."  United States v. Crutchfield, 26 F.3d 1098, 1099 (11th Cir. 1994) (quoting United States v. McLain, 823 F.2d 1457, 1462 (11th Cir. 1987)).

To establish prosecutorial misconduct, the defendant must show that (1) the prosecutor made improper remarks and (2) the remarks prejudicially affected the defendant's substantial rights.  United States v. Eckhardt, 466 F.3d 938, 947 (11th Cir. 2006).  The misconduct results in prejudice to the defendant's substantial rights where, if not for the allegedly improper remarks, the outcome of the trial would have been different.  Id.  Hence, where there is sufficient independent

evidence in the record to support the defendant's guilt, the alleged error is harmless. Id.

Morris takes issue with several prosecutorial comments and with the way the government presented its case at trial. From the outset, Morris argues that the prosecutor acted improperly during his opening statement by telling the jury that the case was about drugs and guns. According to Morris, this suggested to the jury that Morris was involved in firearms offenses even though only defendant Hood was charged with a gun-related crime. In addition, Morris asserts that the government front-loaded its case-in-chief with evidence regarding guns, devoting approximately the first five hours of testimony to the firearms found during the search of 1606 Hibiscus. Morris also takes issue with the government's closing statement, arguing that the prosecutor engaged in misconduct by improperly suggesting to the jury that a video of 6226 Demery showed Morris carrying a gun in his hand. Ultimately, Morris contends that these improper statements had the cumulative effect of linking guns and drugs with all the defendants, resulting in the undue suggestion that Morris was involved in more illegal activity than the evidence shows.

Morris acknowledges that his counsel did not object to any of these matters at trial. Accordingly, we review only for plain error. See Merrill, 513 F.3d at 1306. On the record before us, we cannot say that the prosecutor's statements or

31

overall presentation resulted in any prejudice to Morris, let alone prejudice so obvious and injurious that failure to correct it would jeopardize the fairness or integrity of the proceedings.

Nothing about the prosecutor's opening statement was improper or prejudicial.  It is true that the prosecutor framed the case from the outset as being about guns and drugs, but this does not mean that the prosecutor improperly suggested to the jury that Morris himself was responsible for the gun offense with which defendant Hood was charged.   The indictment and the verdict forms made it clear that Morris was not charged with anything other than drug crimes. This was reiterated in the jury instructions, where the district court stated that the firearms charge only applied to "Defendant Lorenzo D. Hood."  Beyond the single opening phrase, the prosecutor never linked Morris to any crime relating to firearms—on the contrary, the government went on to explicitly state which defendants were on trial for which specific charges.

Nor was it improper or prejudicial for the government to begin its case-in-chief with testimony regarding Hood's firearms.  There is nothing abnormal about coconspirators being tried together, and Morris acknowledges that there was nothing improper about his being tried alongside Hood.  See United States v. Astling, 733 F.2d 1446, 1454 (11th Cir. 1984) ("[C]oconspirators should be tried jointly . . . and severance is not warranted despite the fact that a defendant may

32

have participated in only a single aspect of the conspiracy.").  None of the defendants in this case requested that they be tried separately.  Thus, Morris should have expected that the jury would hear evidence at some point supporting the gun charges against Hood.  The government's first witnesses, who did focus primarily on the guns found at 1606 Hibiscus, never suggested that anyone other than Hood was in possession of them.  Indeed, Morris was not even mentioned until the government called Nixon to testify on the third day of trial.

We additionally conclude that there was no prejudicial misconduct when the prosecutor suggested, during closing argument, that Morris was carrying a gun in video footage of him at 6226 Demery.  This Court has long recognized the close connection between guns and drugs.  United States v. Lopez, 649 F.3d 1222, 1242 (11th Cir. 2011) (noting that guns go "hand-in-hand" with illegal drug operations and that guns are the "tools of the [drug] trade").  In light of this close connection between firearms and drug trafficking operations, we doubt that the suggestion that Morris was carrying a gun would have shocked or swayed the jury with respect to its finding that Morris was engaged in a conspiracy to traffic in cocaine and heroin. That is, we do not believe that such a suggestion is unduly prejudicial.

Either way, in light of the substantial evidence linking Morris to the drug conspiracy at 6226 Demery, we cannot say that, but for the prosecutor's comments and presentation, the outcome of the trial likely would have been different.

33

Eckhardt, 466 F.3d 947.  This is especially true under the present circumstances, where we review the prosecutor's alleged misconduct for plain error; we cannot conclude that even an assumed error associated with these comments would be "so pronounced and persistent that it permeate[d] the entire atmosphere of the trial." Crutchfield, 26 F.3d at 1099; Merrill, 513 F.3d at 1306-07.  The comments the prosecutor made were isolated and minimal in comparison to the other evidence adduced at trial regarding Morris's illegal conduct.  Morris's counsel diffused the effect of those remarks in his own closing.  And the order of the evidence could not have been so disruptive as to change the outcome of the proceedings.  In short, we reject Morris's argument that the alleged prosecutorial misconduct had the cumulative effect of prejudicing his substantial rights.  Eckhardt, 466 F.3d at 947.

Therefore, we affirm both his conspiracy conviction (Count 1) and his substantive drug conviction (Count 7).

## IV.  HOOD

### A.    Motion to Suppress

First, Hood submits that the district court erred in denying his motion to suppress the evidence found during the search of 1606 Hibiscus.  In particular, he argues that the officers who swept the house lacked articulable facts suggesting that there was an individual in the home who might pose a threat to officers executing the arrest warrant.

34

On appeal of the denial of a motion to suppress, we review the district court's findings of fact for clear error and its application of the law de novo, construing the facts in the light most favorable to the prevailing party below. United States v. Lewis, 674 F.3d 1298, 1302-03 (11th Cir. 2012).

Though the Fourth Amendment ordinarily requires law enforcement to obtain a warrant before searching a home, our constitutional jurisprudence allows officers to conduct a warrantless "protective sweep" of a house while arresting a suspect inside the home. Maryland v. Buie, 494 U.S. 325, 331-35 (1990). A "protective sweep" is defined as "a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others." Id. at 327. These sweeps are confined to a "cursory visual inspection of those places in which a person might be hiding." Id. As a rule, officers may, "without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched." Id. at 334. But to search areas beyond the immediate vicinity of the place of arrest, officers must have "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors" an individual posing a threat. Id.; United States v. Delancy, 502 F.3d 1297, 1307 (11th Cir. 2007). In the course of a lawful protective sweep, officers are "free to seize any evidence they discovered in

35

plain view within the proper scope of the protective sweep." United States v.
Tobin, 923 F.2d 1506, 1513 (11th Cir. 1991) (en banc).

Here, Hood contends that, when officers swept 1606 Hibiscus after taking
him into custody, they exceeded the scope of a permissible protective sweep.
Hood asserts that the officers moved him outside the home, at which point the need
to sweep for dangerous individuals was extinguished.  In addition, Hood argues
that the officers who conducted the sweep had no basis for believing that there was
anyone else inside the home who presented a danger.  We find these arguments
unpersuasive.

Because they are crucial to our resolution of this issue on appeal, we briefly
revisit the facts on which the district court relied in denying the motion to suppress.
Officers sought to locate Hood because they were tasked with executing a warrant
for his arrest.  These officers believed that Hood might be inside the residence at
1606 Hibiscus because his driver's license listed that address and because officers
saw a motorcycle parked near the front of the house which matched the description
of one he was known to use.  While conducting surveillance, officers noticed
someone peeking out of the blinds of a window with a black object on the north
side of the front room of the house.

After officers entered the house, Hood emerged from an area to the rear on
the south side of the house, opposite the area in which officers saw someone

36

peeking through the blinds.  Officers arrested Hood while he was still inside the house, and then took him outside.  One officer noted that Hood's attitude and conduct appeared to be evasive.  Several officers testified that they feared someone else might be hiding in other areas of the house.

When officers walked into the room from which they saw someone moving the blinds, they saw, in plain view, a rifle and scope, which looked like the object they had seen earlier peeking through the blinds.  Officers looked into an open closet door, where they believed someone might be hiding, and found several more firearms.  Other officers checked the kitchen and rooms on the south side of the house to ensure that no one was inside.  These officers found ammunition, drugs, and drug paraphernalia.  Hood does not argue that these factual findings were erroneous.

After careful consideration, we agree with the district court that the officers did not exceed their authority in conducting the protective sweep.  Accordingly, we conclude that the district court did not err in denying Hood's motion to suppress the evidence found during the 1606 Hibiscus search.

Contrary to Hood's assertion, the officers had a sufficient factual basis to justify their belief, after taking him into custody, that there may have been someone else inside the home who still posed a danger to officers.  The officers saw someone manipulate the blinds in the front of the house from a room on the

north side, whereas Hood emerged from an entirely different part of the house. In addition, officers noted that Hood exhibited evasive behavior after being taken into custody. These facts, which were specific and articulable, would lead a reasonable officer to believe that someone else might be in the house and that a protective sweep was necessary for safety reasons. See Buie, 494 U.S. at 334; see also United States v. Carballo, 595 F.3d 1214, 1223 (11th Cir. 2010) (holding that a protective sweep was justified based on the defendant's conduct, which included "nervous" behavior).

We also reject Hood's contention that the officers' sweep was unjustified because he was taken outside after being placed in custody. A protective sweep of a home is authorized, even where a suspect is apprehended outside of a house, so long as officers have reason to believe that there is someone inside the building who would still pose a danger to officers. United States v. Burgos, 720 F.3d 1520, 1525 (11th Cir. 1983) (concluding that officers conducted a reasonable sweep inside the home after taking a suspect into custody outside the home based on their belief that someone was inside and potentially armed). Here, Hood was apprehended inside the house under circumstances that led officers to believe that someone else was inside who might pose a threat to their safety. This is particularly true given the fact that the window—in which movement had been observed—had line-of-sight to where the officers' vehicle was located. A brief

38

visual inspection of the front bedroom revealed that the occupants of the home had access to weapons that could be used to harm the officers, given that line-of-sight. On this record, there was nothing unreasonable about the officers' decision to conduct a protective sweep despite having taken Hood outside.

In addition, we disagree with Hood's assertion that the protective sweep exceeded its permissible scope under Buie. The officers entered rooms throughout the house to conduct a quick visual sweep of any areas that might harbor dangerous individuals. There is nothing in the record indicating that officers either searched an area that could not harbor an individual or needlessly extended the search's duration. In particular, one officer testified that the sweep took no longer than three or four minutes, lending support to the conclusion that the sweep was cursory in nature. Under such circumstances, the protective sweep was lawful. Buie, 494 U.S. at 334.

Based on the foregoing, we affirm the denial of Hood's motion to suppress evidence seized during the search of 1606 Hibiscus.

**B.    Motion for Judgment of Acquittal as to Cocaine Charges**

Second, Hood asserts that the district court erred in denying his motion for judgment of acquittal on his cocaine convictions in Counts 5, 6, and 8. Hood's argument on this issue is limited to a single sentence, in which he contends that there was "no evidence to support" his substantive cocaine charges.

39

As an initial matter, it bears noting that an appellant is deemed to have abandoned a claim where he raises it in a perfunctory manner without meaningful argument or citation to authority. Sapuppo v. Allstate Floridian Ins. Co., 739 F.3d 678, 681 (11th Cir. 2014). Hood has abandoned this claim because of the way in which he raised the issue. He cites no authority, articulates no specific issue, and provides no examples from the record to support his position.

Even so, were we to address his assertion on the merits, a thorough review of the record leads us to conclude that the district court properly denied Hood's motion for judgment of acquittal. The evidence confirms that confidential informant Nixon bought cocaine from Hood during a controlled purchase at 6226 Demery. In addition, during a search of 6226 Demery, officers found cocaine and heroin inside the house, along with evidence indicating that Hood resided in that house with his girlfriend. Another confidential informant testified that it appeared that the people working inside 6226 Demery were working for Hood. The drug paraphernalia discovered at this house also tended to show that Hood was trafficking in cocaine. Finally, when officers arrested Hood at 1606 Hibiscus, they found a substantial amount of cocaine inside the master bedroom, as well as more drug paraphernalia.

Under Rule 29 of the Federal Rules of Criminal Procedure, the district court did not err in denying Hood's motion for judgment of acquittal at the close of the

government's case.  Because there was substantial evidence from which a reasonable jury could conclude that Hood was guilty of the various individual cocaine crimes with which he was charged, we affirm the denial of his Rule 29 motion.  See United States v. Gonzalez, 834 F.3d 1206, 1214 (11th Cir. 2016).

## V.  CONCLUSION

In accordance with the foregoing, as to the convictions of Lesane, Morris, and Hood, we affirm.  With respect to the district court's finding that Lesane qualified as a career offender under the sentencing guidelines, we vacate and remand for resentencing.

**AFFIRMED IN PART, VACATED IN PART, AND REMANDED.**